### UNITED STATES v. TILLINGHAST et al.
### No. 2775.

Circuit Court of Appeals, First Circuit.
March 14, 1934.

Helen R. Carloss, Sp. Asst. to Atty. Gen. (Sewall Key, J. Louis Monarch, and Frederick W. Dewart, Sp. Assts. to Atty. Gen., and Henry M. Boss, Jr., U. S. Atty., of Providence, R. I., on the brief), for the United States.

Frederick W. Tillinghast and Robert B. Dresser, both of Providence, R. I. (Robert E. Jacobson, Roger T. Clapp, Ronald B. Smith, Hinckley, Allen, Tillinghast, Phillips & Wheeler, and Edwards & Angell, all of Providence, R. I., on the brief), for appellees.

Before WILSON, and MORTON, Circuit Judges, and MORRIS, District Judge.

MORTON, Circuit Judge.

This is a bill in equity brought by the United States against individual defendants to recover excess profits taxes assessed for 1917 against the Crefeld Company, a corporation which was liquidated and all its assets distributed, before the end of 1918, and which was legally dissolved in November, 1923. The defendants were shareholders in the corporation and as such received proportionate parts of the distributed assets. The present suit is, in effect, one to collect a tax by following these assets into the hands of the distributees. In the District Court the bill was dismissed on final hearing, and the government has appealed. The complicated facts are, except on one important point, not in dispute.

The Crefeld Company was a Rhode Island corporation which dealt in cotton and woolen wastes. In 1905, presumably for the purpose of extending its business in the Southern States, it caused the South Atlantic Waste Company to be organized under the laws of North Carolina. The new company issued at par ($100) 1,000 shares of its capital stock, of which the Crefeld Company took 788 shares, paying therefor $78,800. The remaining 212 shares were taken and paid for by other persons. From time to time the Crefeld Company made loans to the South Atlantic Company; and in 1911 these loans for which the Crefeld Company held the South Atlantic Company's notes aggregated about $365,000.

In May of that year it was arranged that, of the 212 outside shares all but 5 or 6 should be turned over to the Crefeld Company, thereby making it the sole stockholder, practically speaking, in the South Atlantic Company;

and that the Crefeld Company would cancel the notes which it held against the other company. This arrangement was carried out; the South Atlantic Company stock was turned over to the Crefeld Company, except a few qualifying shares for officers, and the Crefeld Company surrendered to the South Atlantic Company the notes referred to. In its income return for the year 1911, under the corporation excise tax law then in force, the Crefeld Company charged off this $365,000 as a loss.

Some six years later, in 1917, the Commissioner on examination of the Crefeld Company's return for 1911, disallowed this item as a loss and, by reason of such disallowance, imposed an additional excise tax which was duly paid by the Crefeld Company. Following this action by the Commissioner, the Crefeld Company amended its books of account and re-credited itself with these notes as an asset; and it brought action on them against the South Atlantic Company in the Rhode Island courts. In that action judgment was entered for the defendant on the ground that the notes were barred by the statute of limitations. At the end of 1917 following this decision, the Crefeld Company again charged off these notes as a loss occurring during that year.

During 1917 and 1918 the Crefeld Company was being liquidated; and in December, 1917, it sold all its stock in the South Atlantic Company, i. e., practically the entire stock of that corporation, for $49,700, or at the rate of $50 per share. In making up its income tax return for 1917, the Crefeld Company deducted its losses on the South Atlantic Company investment. This deduction overbalanced all gains and profits, and the return showed a substantial loss for the year. No income tax, therefore, appeared to be due, and none was paid.

The income tax return which the Crefeld Company made for 1917, and duly filed in March, 1918, was on the regular government form 1031. It was full and accurate. The government concedes that no fraud is involved. The return stated and claimed the loss on the South Atlantic Company investment. As no profit was shown, no excess profits tax return on form 1103 was understood to be called for; and none was filed. There the matter lay for nearly five years.

In March, 1923, the Commissioner, on review and audit of the Crefeld Company's 1917 return, found that the company was not entitled to so large a deduction as it had taken on account of its loss on the South Atlantic Company transactions; and he cut down this deduction to about $35,000. This change resulted in setting up a large net income in place of the loss which had been returned. The income thus set up was subject to excess profits taxes. Such taxes were thereupon assessed against it in March, 1923, in the amount of $118,773. At that time, as has been said, the Crefeld Company had been completely liquidated and the last of its assets distributed, for more than four years. Some two years more went by with no other action by the government in the matter; then in 1925 a suit like the present one was brought by the government against the present defendants or their predecessors in interest, to collect the assessment from the distributees. In the meantime the distributees had included the sums received by them in their individual income tax returns; and some of them showed in the present case that they had been assessed and had paid taxes on their parts of the sums so received; and that their applications for refund had been denied. The suit brought in 1925 was dismissed for lack of prosecution in November, 1928. In February, 1929, the present suit was brought; it is substantially like the one which was dismissed.

■ The question naturally suggests itself how can the government sue in 1929 for a 1917 tax which would ordinarily have become outlawed in 1923? The answer made by counsel for the government is that there is no statute of limitations on this tax, because no excess profits tax return was filed by the Crefeld Company for 1917 and, by the terms of the statute, where no return was filed there is no limitation of time on the government's right to sue. The defendants contend that the Crefeld Company's return for 1917 was correct and met all legal requirements, that the change in the return made by the Commissioner was unjustified, and that the statute has run.

The statutory provisions as to such tax returns were that each corporation should "render a true and accurate return of its annual net income in the manner and form to be prescribed by the commissioner * * * and containing such facts, data, and information as are appropriate and in the opinion of the commissioner necessary to determine the correctness of the net income returned and to carry out the provisions of this title." Revenue Act 1916, § 13 (b) (39 Stat. 771), incorporated by reference into Revenue Act of 1917, § 212 (40 Stat. 307). The basic provision creating the excess profits tax reads as

follows: "That in addition to the taxes under existing law and under this act there shall be levied, assessed, collected, and paid for each taxable year upon the income of every corporation * * * a tax * * * equal to the following percentages of the net income." Revenue Act 1917, § 201 (40 Stat. 303). This provision was apparently copied, mutatis mutandis, from that imposing the surtax. See Revenue Act of Sept. 8, 1916, § 1 (b), 39 Stat. 756. With regard to the excess profits tax, the Commissioner of Internal Revenue said: "It is an income tax in addition to the regular income tax of September 8, 1916, as amended, and the war income tax of October 3, 1917. It is more than a tax on 'war profits'; it reaches all income in excess of a stipulated normal deduction." Corporation Trust Co., 1918 War Tax Service, Excess Profits Tax Letters, p. 1.

What returns were required under the excess profits tax was for the Commissioner to determine by regulations duly made. The regulations made under this statute were that: "Every domestic corporation which has for the taxable year a net income of $3,000 or more is * * * required to make a return and to pay the tax as named." Regulations 41, art. 10, relative to excess profits tax. "The net income of a corporation for the taxable year shall be determined by adding (1) the amount of the net income *ascertained and returned* (italics supplied) for income tax purposes," etc. Excess Profits Tax Regulations, art. 28. As to form 1103, the absence of which is said to make this a "no-return" case, to which the statute of limitations does not apply, the regulations provided and the form stated as follows: "Who must make a return on form 1103.—Every corporation having for the taxable year a net income of $3,000 or more *(see form 1031)* must make a return on this form" (1103), etc. (Italics supplied.) The first item on 1103 is: "(1) Net income taxable for year shown in item 8 form 1031."

Counsel for the government urge that, though no net income was shown on form 1031, but on the contrary a net loss, it was still the duty of the Crefeld Company under the statute and regulations to fill out and file form 1103; that if it failed to do so, it took the risk of finding itself in a "no-return" position on the excess profits tax, in case the Commissioner should amend the income tax return so as to show a taxable profit.

As has been said, the duty to make returns is defined by the regulations; and the question presented depends, in the first instance at least, on the correct interpretation of the regulations above referred. Speaking with reference to cases like the present one, not involving fraud, it seems to us very clear that the intention of the regulations was that only such corporations as showed a net income on their income return (form 1031) were required to make and file the additional return for the excess profits tax (form 1103). As above pointed out, form 1103 starts with the *net income* from form 1031. By the explicit language of article 28, supra, this same amount is referred to as the first item of the excess profits tax return. The general understanding of these regulations and instructions would certainly be that, if no net income was shown, no excess profits tax return was called for. There was an official ruling to this effect made by an assistant to the Commissioner on March 24, 1919. Montgomery's Excess Profits Tax Procedure for 1921, p. 30. Our attention has been called to no requirement or intimation in the regulations that an excess profits tax return should be filed when no net income was reported. A contrary view puts upon the taxpayer, not only the duty of making an honest and full return according to its light, but of forecasting all doubts and questions which might be made by the government as to the correctness of its return, and of filing alternative returns, based on facts which it did not concede, in order to provide against a possibility that the Commissioner on final re-examination might change the character of the return. This view of the regulations seems to us unreasonable. We think they mean that if an income tax return honestly made on form 1031 showed no profits in excess of $3,000, no supplementary return under the excess profits tax was required. Such an interpretation works no hardship on the government because an audit of the income tax return would show whether any excess profits tax was due. Cases of fraud by the taxpayer stand on a very different footing; the government is amply protected by the statutory provisions relating thereto.

■ We have great doubt whether, under the circumstances herein disclosed, form 1103 can properly be regarded as a separate return, failure to make which bars the running of the statute of limitations. A separate form is not necessarily a separate return within the meaning of the statutory provisions relating to limitations. As has been said, the excess profits tax was essentially a surtax on corporations, based on the corporate income considered with relation to invested capital. Even if it be regarded as a separate tax, it

did not necessarily call for a separate return. Indeed, in years subsequent to 1918 the income tax form was extended so as to include such information as was necessary for the assessment of the excess profits tax. Form 1103 was at one time certainly regarded by the Treasury Department merely as supplemental to the return on form 1031. See Treasury Decision 2561. All the essential facts about the Crefeld Company's income and the claim to deduction on which this case turns, were stated, or the door of inquiry as to them was pointed out, in the return filed. The excess profits tax form was not, and did not purport to be, complete in itself; it began where form 1031 left off. It is well settled that a failure, due to honest mistake, to file a required schedule does not involve the penalties imposed for not making any return. Florsheim Bros. Co. v. United States, 280 U. S. 453, 462, 50 S. Ct. 215, 74 L. Ed. 542; Martin Hotel Co. v. Commissioner, 18 B. T. A. 826; Peerless Iron Pipe Exch. v. Commissioner, 23 B. T. A. 900; Hartford-Connecticut Trust Co. v. Eaton, 34 F.(2d) 128 (C. C. A. 2); Commissioner of Internal Revenue v. Stetson & Ellison, 43 F.(2d) 553 (C. C. A. 3); Myles Salt Co., Ltd., v. Com'r, 49 F.(2d) 232, 233 (C. C. A. 5).

We have carefully examined the decisions relied on by the government in support of its contention that this is a no-return case. There is in some of them language which appears to cover the present case, but the facts, with reference to which the language was used, were radically different. In Beam v. Hamilton (C. C. A.) 289 F. 9: "No return whatever was made of his income from his personal business as distiller, etc., from which he received during 1917 an income of $51,994.70." Knappen, J., 289 F. 9, at page 10. In the Updike Case (United States v. Updike) (D. C.) 1 F.(2d) 550, no return at all was made, the corporation contending that it was not taxable. In McDonnell v. United States (Ct. Cl.) 59 F.(2d) 295, the income return showed a net profit of over $3,000. An excess profits tax return was therefore called for by the regulations. In some others of the decisions relied on, form 1031 (the basic income tax return) was not filed. In none of them was there a full statement of the facts relating to income; and in none of them was there a situation like that presented here, viz., an honest return showing no income which was converted—or attempted to be converted—into a return showing income by action of the Commissioner, not agreed to by the taxpayer.

All the foregoing discussion is based upon the assumption that the Commissioner was right in reducing from about $350,000 to about $35,000, the allowable deduction for the Crefeld Company's losses in its investment in the South Atlantic Company. The defendants strongly urge that this action by the Commissioner is shown to have been completely untenable; and the District Judge so found. The question before us on this point is whether he appears to have been wrong in law, or clearly wrong on the facts.

The Crefeld Company invested in the South Atlantic Company about $80,000 in stock and about $365,000 in loans, a total of $443,000; it realized on this investment, when closed out, about $50,000. On the face of the figures there appears to have been a loss of about $393,000. The investments were all made before 1 March 1913; and it is clear that a good deal of the loss in the value of them had occurred before that date. The data on which the Commissioner made his findings as to the values of the South Atlantic stock at the time of its acquisition, and as of March 1, 1913, were put in evidence before the District Judge and considered by him. He also heard oral testimony from several witnesses bearing on this point. He concluded that the data on which the Commissioner relied were clearly insufficient on which to make any reasonable estimate of value of the South Atlantic Company stock. He held that the prima facie case, in favor of the Commissioner's action, had been overcome by the evidence disclosing how it was arrived at; and that the government, having introduced no further evidence, had failed to show that any excess profits tax was due.

The valuation of the Crefeld Company's stock in the South Atlantic Company presented a difficult and tricky question. The Commissioner relied solely on the annual statements of operations and of financial condition made by the South Atlantic Company from year to year. There were no sales of its stock which would assist in fixing the market value. It was always a largely owned, and after 1911 a completely owned, subsidiary of the Crefeld Company. The Commissioner found that the South Atlantic stock acquired by the Crefeld Company on original subscription in 1905 was worth on March 1, 1913, $90 per share. He found that the South Atlantic stock obtained by the Crefeld Company by surrender of the notes above referred to had cost it only $64 per share. He accordingly adopted those figures, i. e., March 1, 1913, value for the first lot of stock, and cost

for the second lot, in setting up the valuation from which he deducted the selling price of $49,700 in order to establish the loss. As has been said, he fixed the cost of that stock solely with reference to the statements of the South Atlantic Company above referred to. He entirely disregarded the value of the $365,000 notes surrendered by the Crefeld Company in return for the 206 shares of stock. He did not find that the stock was then worthless in view of the South Atlantic Company's indebtedness. Nor was he putting a value on the stock after the notes had been canceled. He was valuing the stock as offered in exchange for the notes.

The District Judge thought that the cost of the 206 shares—and perhaps the value of the South Atlantic Company stock on March 1, 1913—depended basically on the value of the $365,000 of notes against that company which were surrendered. The surrender of the notes might well be regarded as being made not merely for the 206 shares then acquired, but on account of the rest of the stock which was already owned by the Crefeld Company. If the stock had a value of $64 per share in 1911, as the Commissioner found, the notes, which of course preceded it, would appear to have been worth much more. As the Crefeld Company already owned about 80 per cent. of the South Atlantic Company, that proportion of the loan was in effect owed by the Crefeld Company to itself; and it might be regarded as having paid about $73,000 for the outside stock, though the statement of financial condition made by the South Atlantic Company for the year in which the transaction took place did not indicate any such value.

Without extending the discussion, it seems clear that the question as to the cost to the Crefeld Company of this stock was, as has been suggested, of the most difficult character, by no means to be fairly determined by considering only the data on which the Commissioner acted. Moreover, there was no evidence before the Commissioner as to the basis on which the statements of condition were made up, whether their values were actual values or not. Witnesses familiar with valuations testified before the District Judge that in their opinion the statements of condition afforded no satisfactory evidence of the value of the stock in question. This testimony was not contradicted—as it easily might have been if unsound—and the government submitted the case without calling any witnesses. There was other evidence introduced or offered by the defendants and excluded on the government's objections, which we do not undertake to discuss. The District Judge was much more in the atmosphere of this difficult question than we are. On all the evidence he was satisfied that the Commissioner's valuation afforded no indication of the true value of the stock.

The Commissioner's decision upon such questions is nearly conclusive, and is final, unless shown to be unreasonable and unsupportable on any fair view of the facts. The burden on the objector is heavy; but in this case it cannot be said as a matter of law that the District Judge was not warranted in finding that the burden had been sustained. United States v. Rindskopf, 105 U. S. 418, 26 L. Ed. 1131; Russell v. Commissioner, 45 F. (2d) 100, 103 (C. C. A. 1). In the latter case it was said, "While there is a presumption that the commissioner's findings are correct * * * when it appears, as in this record it does appear, that the methods pursued by the commissioner were mathematically and legally erroneous, that presumption no longer avails." We cannot say that the District Judge was clearly wrong in his findings and conclusions.

It is unnecessary to consider the other questions which have been argued. The judgment appealed from must be affirmed.

The decree of the District Court is affirmed.

WILSON, Circuit Judge (concurring in result).

I concur in the result of the majority opinion, but on the ground that the government has not shown that there was any excess profits tax due. The finding of the Commissioner is only prima facie evidence of its correctness, and it may be overcome by evidence by the taxpayer, which the District Court found was clearly overcome in this case. I think his finding must stand. The government then failed, in a suit to recover taxes, to show that there was any tax due and its suit was properly dismissed by the District Court.

It is, therefore, not necessary to consider whether the statute of limitations had tolled the action or not. In face of all the decisions by the courts, however, in which they have held that a return for excess profits tax was not a part of the return for a normal tax but supplementary thereto, and have held that it was a separate return, and since the Supreme Court has denied certiorari in several such cases, I do not think I can agree that the statute of limitations as to excess profits taxes

began to run in this case at the time of the filing of the return No. 1031. McDonnell v. United States (Ct. Cl.) 59 F.(2d) 295; Atterbury v. United States (Ct. Cl.) 59 F.(2d) 300.

Bean v. Hamilton (C. C. A.) 289 F. 9; United States v. Updike (D. C.) 1 F.(2d) 550. Certiorari was denied by the United States Supreme Court, 271 U. S. 661, 46 S. Ct. 473, 70 L. Ed. 1138, in the case of United States v. Updike (D. C.) 1 F.(2d) 550, which was affirmed by the Circuit Court of Appeals for the Eighth Circuit in 8 F.(2d) 913; and in the case of McDonnell v. United States, supra, certiorari was also denied by the United States Supreme Court in 287 U. S. 648, 53 S. Ct. 95, 77 L. Ed. 560.

The Commissioner, after examining the taxpayer's return and records, notified the taxpayer that an excess profits tax return was required, which it refused to file. It seems to me, therefore, that the statute of limitations had not run when this suit was brought, as to any excess profits tax, if any existed.