*Decision will be entered under Rule 50.*

NICHOLAS ROERICH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83065. Promulgated September 21, 1938.

*Herbert Plaut, Esq.*, and *Sidney Portnof, Esq.*, for the petitioner.
*Lloyd W. Creason, Esq.*, for the respondent.

574

OPINION

STERNHAGEN: 1. The first and principal question is whether the $73,300 and $74,221.79 deposited by Horch in the petitioner's individual account in 1926 and 1927, respectively, were his, and more particularly, were proceeds to him from the sale of his paintings, as the

Commissioner has determined. This question turns upon a determination of fact as to which there is a flat conflict of the testimony of petitioner, the alleged seller, and Horch, the alleged buyer. It is clear that Horch placed the money in petitioner's account and that petitioner used it. The amounts are said categorically by Horch to have been the purchase price of petitioner's paintings, and categorically by petitioner to have been gratuitous contributions by Horch to defray the cost of the Asiatic expedition. Petitioner says, "I sold no paintings or any other thing for said $73,000 to Horch or any other person." "I sold no paintings or any other thing for said $74,271.78 to Horch, his wife, or any other person." Horch says, "In 1926 I bought paintings from petitioner which were in this country prior to that year. In 1926 I paid for the paintings $73,300. In 1927 I bought more for about $74,000. These amounts bore no relation to what I loaned or advanced for use by Roerich in any one of his expeditions. These were all purchases of paintings. I gave additional monies for expeditions." So it is necessary to consider the circumstances to reach a decision, not definitively as to a sale of the paintings to establish title, but as to whether petitioner received income. The question of title is only justiciable here as a postulate.

Petitioner's counsel seeks to discredit Horch's testimony by charging him with bad faith as a vindictive informer. This is perhaps not an unnatural attitude for petitioner. But the Board must remain unmoved by the sentiments growing out of the changed spiritual or emotional relations of these men and endeavor from a detached viewpoint to make a fair and impartial appraisal of the evidence. It does not appear that Horch was an informer. The Government's investigation seems to have begun with the petitioner's bank account, and Horch was called upon for information when it was found that he had had a power of attorney. He requested a summons before giving his information; but it would be ironic indeed if that made his evidence less reliable than if he had volunteered it. Before the Board, where he was called as a witness for the Government, his testimony was covered by searching cross-examination. It was through this witness that most of the facts were placed in the record. The petitioner lives in India, and his evidence is by way of answers to written interrogatories—a form of evidence far from satisfactory, since it omits confrontation and personal cross-examination by a challenging adversary. Without this, one is left in suspense by the inconsistency or lack of precision of several of the answers to the interrogatories. For example, what precisely is meant by Roerich's answer that his 1928 written "confirmation" of sale to Horch was "a pure formality" signed "for technical reasons?" How is one to interpret the equivocal statement that the valuation and prices fixed for

the paintings were "not necessarily for purposes of sale?" If Horch were a rogue whose testimony were not to be believed, there would still be not enough on petitioner's side to overcome the Commissioner's determination and the face value of the documentary and other written evidence which supports it.

We are convinced by the evidence that the petitioner intended to sell and did sell paintings and that the amounts in question which Horch deposited in his bank account must be regarded as the price received for paintings and were therefore his income, as the Commissioner has determined.

Petitioner clearly contemplated the sale of his paintings when in 1922 he gave to Corona Mundi the exclusive right to sell all his paintings and books throughout his lifetime; when, in May 1923, he expressly granted that corporation the exclusive right to purchase the paintings which might result from the Asiatic expedition and stated the terms of purchase as "according to the present prices of my paintings"; and when, in April 1923, he gave Horch a general power of attorney which expressly included the power "to sell such of my paintings * * * at such price and upon such terms as he may deem advisable." In 1925 his correspondence clearly manifests a continuing purpose to sell the paintings then on loan to the Museum for exhibition purposes, fixes the prices of the 1925 paintings as those on the 1924 "price list", and contemplates a later "distribution of money for the paintings." The 1926 catalogue of the Museum indicates these paintings as in the loan exhibition, and in the 1929 catalogue this indication has been removed and some pictures are shown as gifts from Roerich and from his wife. There is no later word of Roerich himself that his purpose to sell had been changed. To say, as petitioner does, that the list prices were fixed for purpose of inventory and insurance may be quite true and yet not incompatible with the purpose of sale.

Horch, to be sure, was in the dual position of acting for himself and acting as Roerich's attorney. This necessitates caution in identifying his acts as between the two. But Roerich does not disavow anything Horch did as his attorney. He doesn't charge an abuse of fiduciary power or a betrayal of trust in respect of the paintings—he doesn't claim that he still owns the paintings. The controversy seems, upon the present record, to be only whether the expedition paintings now apparently owned by the Museum [1] were acquired by it from Horch or from Roerich. As to this, the evidence, while not free from doubt, is far stronger that Roerich was paid for them by Horch than that Roerich gave them to the Museum. Horch says

---

[1] But see the statement of September 10, 1928, that they had been transferred to Nicholas Roerich Painting and Art Collections, Inc.

that whenever he wrote, either in his own records or in communications to Roerich, that he was making the loan exhibition permanent, he meant that he was buying the paintings. This is not difficult to believe. It is entirely consistent with Roerich's purpose to sell the paintings. On the other hand, if Horch's statement that the loan exhibition was being made permanent is to be regarded as being made by him as attorney for Roerich and as applying to any act of donation made by his principal, it would be a kind of fiduciary act not clearly covered by the terms of his power of attorney and widely at variance with the express power to sell the paintings. Indeed the cable sent by Horch on October 19, 1926, said not merely that the loan exhibition had been made permanent, but that it had been "made permanent *by Odomar*", which was their code name for Horch. We find it much easier to believe that Roerich adopted Horch's paying for the paintings and making the loan exhibition permanent as Horch's own act than that Roerich silently ratified a donation of the paintings made in his behalf by his attorney without express authority.

The circumstances of the payments by Horch fit so well into the terms of sale which Roerich had stated that the inference is difficult to resist. Although Horch had with others made large voluntary contributions to finance the Asiatic expedition, these particular amounts were immediately identified on Horch's records of bank deposits and later in his financial report to petitioner with making the loan exhibition permanent. This identifying notation on the report to petitioner in 1928 was never questioned by petitioner, and was apparently accepted equally with that of the sale to Crane for $2,000 and to Mrs. Getz for $900.

Petitioner proved by Lichtmann and Miss Grant that their contributions of $500 and $200 to the 1926 fund of $75,000 were gratuities, and urges this as evidence that no part of the $75,000 was otherwise. Their intention as to their contributions does not, however, give a similar character to Horch's payment. There is no occasion, such as the promotion of justice among them, which requires that Horch should be held to have made a gift despite his own testimony that he did not intend to do so. A gift is not ordinarily to be presumed and evidence by the alleged donor himself is of prime importance. *Botchford* v. *Commissioner*, 81 Fed. (2d) 914 (C. C. A., 9th Cir.); *Bass* v. *Hawley*, 62 Fed. (2d) 721 (C. C. A., 5th Cir.); *Fisher* v. *Commissioner*, 59 Fed. (2d) 192 (C. C. A., 2d Cir.). So it is not necessary to say, as petitioner does, that if Horch bought paintings for his contribution of $73,300, then Lichtmann and Grant each likewise must have bought an aliquot part of the paintings, and that since an apportionment to them is mathematically difficult, this

completely destroys all demonstration of a purchase by Horch. The Commissioner has not treated the Lichtmann and Grant amounts as income to petitioner, and there is therefore no necessity here to deal with them on their own account. The $2,900 received from Crane and Getz is now admitted by petitioner to have been income to him from the sale of paintings in 1926, and these three amounts embrace all that the Commissioner has included in income as received for the sale of paintings.

The $74,271.78 paid by Horch in 1927 was in exact conformity with the terms of sale laid down by petitioner and was thus accounted for in a report which was received by him without protest in 1928, long before there was any friction between them and when Roerich could easily have corrected errors.

As against this circumstantial evidence and Horch's direct testimony, the direct statement of Roerich denying a sale loses its force. In addition to these prior and contemporary facts is the written confirmation of August 29, 1928, signed by petitioner about the time when he received Horch's itemized account. This provides a substantial assurance of the fact of sale. Petitioner would put it aside as unsubstantial because given, as he says, at Horch's request "for technical reasons." This is quite meaningless and suggests no ground for disregarding the writing. Petitioner was by no means ignorant, and he cannot be heard to say that he didn't mean what he so clearly and deliberately wrote, especially when the written statement is entirely consistent with and "confirms" what is otherwise evident. There is no reason to believe that Horch was imposing on petitioner. He was clearly supplying the funds, and the purchase price paid was the amount petitioner had himself fixed. So why should Roerich not be expected to sign a confirmation of sale? If we cannot give credence to a written statement like this, then which of his statements are to be respected? A disclaimer of such a clear written statement casts a shadow over all his statements. And the shadow is deepened by the writing, signed in September 1928, purporting to transfer paintings to an organization, which has not been otherwise referred to, called Nicholas Roerich Painting and Art Collections, Inc.; by the inexplicable promise of the Museum in November 1929 to pay petitioner 4 percent on a $200,000 valuation of his paintings, and the payment of the 4 percent for over a year; and by the itemized claim against the Tibetan Government, prepared at Roerich's personal direction in India, which included "Prof. Roerich's wages $100,000" (Roerich was to receive no wages), and "Loss of orders in paintings which could not be accepted by Professor Roerich because of impossibility of communication $50,000."

It is therefore held that the petitioner in 1926 received $76,200 as his individual taxable income from the sale of paintings, and in 1927

received $74,271.78 similarly. The Commissioner's determination to this effect is sustained.

2. As to the sale of paintings in 1934, the Commissioner determined the amount so received by petitioner to be $8,569. The evidence shows, as petitioner admits, that six paintings were sold for $6,219, and that a commission of $150 was paid, leaving a net received by him of $6,069. This net amount is properly to be included in petitioner's taxable income on that account for 1934.

3. Petitioner's statement that in 1934 he made charitable contributions of $1,300 to the Roerich Museum, Inc., and Master Institute of United Arts, Inc., and $1,470 to the Urusvati Himalayan Research Institute is not proven by evidence sufficient to support findings to that effect. Deductions of such amounts are therefore not properly allowable.

4. The Commissioner determined that the petitioner's income for 1926 and 1927 included several items of interest, an item of profit from the sale of Liberty bonds, and an item of book royalty. These items were credited to petitioner's bank account during the years in question and the evidence provides no reason to exclude them from his taxable income. The Commissioner's determination as to these items is sustained.

5. The respondent, by amended answer, affirmatively pleads that for 1934 petitioner's taxable income should include $5,743.75 compensation and subsistence paid to him by the United States Government for his services in seeking drought-resisting grasses in Asia. The petitioner, admitting the facts, argues that since he is a nonresident alien and since the amount was received for services performed outside the United States, it is not subject to tax. This argument is clearly correct in view of the plain language of sections 211 (a) and 119 (c) (3) of the Revenue Act of 1934.[2] The Commissioner's argument that the amounts, being paid by the United States, were necessarily from sources within the United States, and that since the statute was expressly broadened as to the tax on interest, it must be regarded as broadened as to compensation for services, is without force against the unambiguous language of the controlling statute. The affirmative claim is denied.

6. In an amended answer filed after the hearing, respondent raised the issue of petitioner's right to the personal exemptions of $3,500

---

[2] SEC. 211. GROSS INCOME.

(a) GENERAL RULE.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States.

SEC. 119. INCOME FROM SOURCES WITHIN UNITED STATES.

\*   \*   \*   \*   \*   \*   \*

(c) GROSS INCOME FROM SOURCES WITHOUT UNITED STATES.—The following items of gross income shall be treated as income from sources without the United States

\*   \*   \*   \*   \*   \*   \*

(3) Compensation for labor or personal services performed without the United States;

and $2,500 which had been allowed him for the three years in question, since he was a nonresident alien and did not file a true and accurate return. In his reply, duly filed, petitioner met the issue and argues to the merits that his income for 1926 and 1927 was less than the exemptions. He contends, however, that respondent's claim must be denied because the pleading of it after the hearing constituted laches. The argument of laches can not avail petitioner now after he has met the issue by his pleading. There is an intimation that had he had an opportunity, he might have met the issue by additional proof; but no objection was made to the pleading, no attempt was made to get the further evidence into the record, no suggestion is made as to the nature or the extent of the countervailing evidence, and it is not easy to imagine what sort of evidence might be available to petitioner to overcome the plain provisions of the statute.

Petitioner was a nonresident alien, and as to him the statute [3] provides that the filing of a true and accurate return is a condition precedent to the allowance of deductions and credits. He filed no returns for 1926 and 1927, and only a tentative return for 1934 which did not purport to be true and accurate. Hence he may not "receive the benefit of the deductions and credits allowed in this title." The allowance of these credits in the Commissioner's determination was incorrect and the affirmative claim as to these items is sustained. *Myra Furst*, 19 B. T. A. 471; *Gladstone Co., Ltd.*, 35 B. T. A. 764 (dismissed, C. C. A., 2d Cir.). This statute would also require the disallowance of the claimed deductions for charitable contributions which have already been denied on another ground.

7. The petitioner filed no returns for 1926 and 1927, and only a skeleton "tentative return" for 1934. The latter was not "the return required to satisfy the statute." *Florsheim Brothers Drygoods Co.* v. *United States*, 280 U. S. 453. The addition to the tax of 25 percent is under such circumstances required for all three years, *Scranton, Lackawanna Trust Co., Trustee*, 29 B. T. A. 698; affd., 80 Fed. (2d) 519; certiorari denied, 297 U. S. 723; *Edmonds* v. *Commissioner*, 90 Fed. (2d) 14 (C. C. A., 9th Cir.), certiorari denied, 302 U. S. 713; *Sabatini* v. *Commissioner*, 98 Fed. (2d) 753; *National Contracting Co.*, 37 B. T. A. 689, 696 (on review, C. C. A., 8th Cir.).

8. The Commissioner in his determination added 50 percent to the deficiencies on the ground that some part of the deficiencies was "due to fraud with intent to evade tax." (Revenue Act of 1926, sec. 275 (b);

[3] [Sec. 217 (g) (1), Revenue Act of 1926.] Except as provided in paragraph (2) a nonresident alien individual * * * shall receive the benefit of the deductions and credits allowed in this title only by filing or causing to be filed with the collector a true and accurate return of his total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

Revenue Act of 1934, sec. 293 (b).) The burden to establish fraud to support the 50 percent penalty is on the respondent (sec. 601, Revenue Act of 1928), and it has been held that the evidence of fraud must be "clear and convincing." *Griffiths* v. *Commissioner*, 50 Fed. (2d) 782 (C. C. A., 7th Cir.); *Henry S. Kerbaugh*, 29 B. T. A. 1014; affd., 74 Fed. (2d) 749 (C. C. A., 1st Cir.). "Mere doubt is not enough", *Arthur M. Godwin*, 34 B. T. A. 485. As to 1926 and 1927, it cannot be said that the deficiencies were due to fraud with intent to evade tax, although there is enough to justify a suspicion to that effect. As to 1934, however, there can be little, if any, doubt that petitioner had income which, as he now admits, was unquestionably his own, in excess of any exemptions to which he might reasonably believe himself entitled, and which he knowingly failed to report. Horch's letter clearly advised him in plenty of time of the need of a return, and he himself had in 1930 signed and filed a return for 1929 which carried a schedule of profitable transactions in securities, including some which had been bought with the proceeds of the sale of his paintings. He knew in 1935 that only the so-called tentative return had been filed showing an estimate of no tax due. He says he relied on Horch to file the return; but he knew within 1935, after he had fallen out with Horch, that no proper return had been filed. The conclusion is inescapable that the failure to file a return for 1934 and the resulting deficiency were due to fraud with intent to evade tax and that 50 percent is properly added to the deficiency.

*Judgment will be entered under Rule 50.*