## FLORSHEIM BROTHERS DRYGOODS COMPANY, LTD., *v.* UNITED STATES.

## WHITE, COLLECTOR, *v.* HOOD RUBBER CO.

Nos. 118 and 414.   Argued January 13, 14, 1930.—Decided February 24, 1930.

454

*Mr. James Craig Peacoék,* with whom *Messrs. Allen Rendall, A. B. Freyer* and *E. H. Randolph* were on the brief, for Florsheim Brothers Drygoods Company, Ltd.

*Mr. Harold C. Haskell,* with whom *Messrs. Frank S. Bright, Charles C. Gammons* and *H. Stanley Hinrichs* were on the brief, for the Hood Rubber Company.

*Mr. Claude R. Branch,* Special Assistant to the Attorney General, with whom *Solicitor General Hughes, Assistant Attorney General Youngquist,* and *Messrs. Sewall*

*Key* and *Barham R. Gary,* Special Assistants to the Attorney General, were on the brief, for the United States and the Collector of Internal Revenue.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

These cases, which were argued together, present the same questions. In each case, the taxpayer seeks to recover with interest an amount assessed and collected, after March 15, 1925, as an additional income and excess-profits tax for 1918 under the Revenue Act of 1918. In each, the claim is that both the assessment and the collection were made after the expiration of the time allowed therefor. In a long line of cases arising out of similar facts, the Board of Tax Appeals has held consistently that neither the assessment nor the collection was made too late.[1] In No. 414 the action was brought in the federal court for Massachusetts against the Collector to recover $39,043.99. The District Court, without passing on the timeliness of the assessment, held that the collection was barred and entered judgment for the plaintiff, 28 F. (2d) 54. The Circuit Court of Appeals for the First Circuit affirmed the judgment on the ground that the assessment was barred, and expressed no opinion on the question decided by the District Court, 33 F. (2d) 739. In No. 118, the action was brought in the federal court for western Louisiana against the United States to recover $11,282.15.

[1] Appeal of Dallas Brass & Copper Co., 3 B. T. A. 856, 863; Appeal of Boston Hide & Leather Co., 5 B. T. A. 617; Pilliod Lumber Co. *v.* Commissioner, 7 B. T. A. 591, 593; Corona Coal & Coke Co. *v.* Commissioner, 11 B. T. A. 240; Ramsey *v.* Commissioner, 11 B. T. A. 345; Floyd *v.* Commissioner, 11 B. T. A. 903, 905; David Rodefer Oil Co. *v.* Commissioner, 11 B. T. A. 782; L. Loewy & Son, Inc. *v.* Commissioner, 11 B. T. A. 596; Peck, Stow & Wilcox *v.* Commissioner, 12 B. T. A. 569; Lamborn *v.* Commissioner, 13 B. T. A. 177, 189; Kaufman *v.* Commissioner, 14 B. T. A. 602.

That court, deciding both questions in favor of the Government, entered a judgment for the defendant, 26 F. (2d) 505, which was affirmed, on both grounds, by the Circuit Court of Appeals for the Fifth Circuit, 29 F. (2d) 895. In other federal courts, also, there has been diversity of opinion.[2] This Court granted writs of certiorari.

*First.* Whether the assessment was barred depends upon whether the period of limitation was started by the filing before March 15, 1919, of a so-called "tentative return," or by the later filing of a so-called "completed return." The question arises in this way. The Revenue Act of 1918 was not approved until February 24, 1919; c. 18, 40 Stat. 1057. Section 241 (a) required that returns on the basis of the calendar year should be made on or before the 15th day of March. Section 239 required that a corporation's return should state "specifically the items of its gross income and the deductions and credits allowed." The form of return prescribed by the Commissioner of Internal Revenue for giving this information, known as Form 1120, is an elaborate document composed of a "summary" in four schedules, with eleven supporting schedules and twenty-six sub-schedules. The "summary" calls for the specification of some 93 items. The supporting schedules and sub-schedules call for the specification of some 357 items; and of as many more items to be stated in appendices as the circumstances of the particular taxpayers might require.[3]

---

[2] In *Brandon Corporation* v. *Jones,* 33 F. (2d) 969 (D. C. E. D. S. Car.), it was held that both assessment and collection were barred. And see *Rasmussen* v. *Brownfield-Canty Carpet Co.,* 31 F. (2d) 89. In the following cases it was held that collection was not barred; the timeliness of the assessment was not questioned: *Bank of Commerce* v. *Rose,* 26 F. (2d) 365 (D. C. N. D. Ga.); *Loewer Realty Co.* v. *Anderson,* 31 F. (2d) 268 (C. C. A. 2d); *L. Loewy & Son, Inc.* v. *Commissioner,* 31 F. (2d) 652 (C. C. A. 2d).

[3] The form described is known as Form 1120, " Corporation Income and Profits Tax Return For Calendar Year 1918," and is a combined return of income, excess-profits and war-profits under the Revenue

It was obvious that many corporations would be unable, in the short interval between February 24 and March 15, to prepare their returns in time. Sections 227 (a) and 241 (a) authorized the Commissioner to "grant a reasonable extension of time for filing returns whenever in his judgment good cause exists." But § 250 (a) provided that "where an extension of time for filing a return is granted the time for payment of the first installment shall be postponed until the date of the expiration of the period of the extension." The necessities of the Government made it undesirable that payments on account of the first instalment of taxes be postponed. To meet this situation, the following policy was announced in a public statement issued by the Commissioner: "Although no general extension of time will be authorized for filing the Federal Income Tax returns due March 15, the Commissioner of Internal Revenue has approved a novel feature of tax collection which will serve for all practical purposes as a possible extension of forty-five days for the filing of corporation income and excess profits tax returns . . . If a corporation finds that . . . it is impossible to complete its return by March 15, it may make a return of the estimated tax due and make payment thereof not later than March 15. If meritorious reason is shown," the completed return could be filed within forty-five days

Act of 1918. Statutes imposing direct taxes have always required taxpayers to file "lists" or "schedules" or "statements" or "returns" specifying in detail the information requisite for an assessment of the tax. The word "return" has not always been used. Sometimes it has been used as a synonym for "list," "schedule" or "statement." The specification in the statutes of the prescribed contents of such lists or returns has varied in its detail. But always definite statements of facts were required, from which the tax could be computed. Act of July 9, 1798, c. 70, § 9, 1 Stat. 580, 585-6; Act of July 1, 1862, c. 119, § § 6, 93, 12 Stat. 432, 434, 475; Act of June 30, 1864, c. 173, § § 11, 82, 98, 102, 109, etc., 13 Stat. 223, 225, 258-86; Act of August 5, 1909, c. 6, § 38, 36 Stat. 11, 114; Rev. Stat. § 3174, U. S. C., Tit. 26, § 93.

after that date. The statement continued: " Provision for systematically handling this new feature will be made in the construction of the new return blanks. . . embodied in which is a detachable letter of remittance. Any corporation which finds that, for sufficient reasons, it cannot complete its return by March 15, may detach and fill out the letter of remittance, and forward same to the collector on or before March 15, together with a check . . . for the tax due on that date. . . . A statement in writing of the reasons why it is impossible for the corporation to complete the return by the specified date must accompany every such remittance." [4] The device was modified by a further statement on February 27, 1919. A separate blank, known as Form 1031T and entitled " Tentative Return and Estimate of Corporation Income and Profits Taxes and Request for Extension of Time for Filing Return," was to be used instead of the detachable letter of remittance. This blank was in the form of a letter to the collector and contained, besides instructions and the oath of the president and treasurer, only a statement that one-fourth of the estimated amount of taxes was remitted therewith and that an extension of time to file the complete return was requested for the reasons stated.

Each corporation executed the tentative return, Form 1031T, and sent it, with a remittance of one-quarter of the estimated tax, to the collector on or before March 15, 1919. The Florsheim Company filed its complete return,

---

[4] This action was taken pursuant to § 1309, which authorized the Commissioner, with the approval of the Secretary, " to make all needful rules and regulations for the enforcement of the provisions of this Act." These public letters from the Commissioner to the Collectors " and others concerned " were issued February 13, 1919; February 27, 1919. See also letters of April 14, 1919, October 3, 1919, and March 17, 1920; and Manual (1920) for the information and guidance of Collectors, §§ 627, 628.

Form 1120, on June 16, 1919; the Hood Company, on July 14, 1919. Section 250 (d) of the Revenue Act of 1918 provided that "the amount of tax due under any return shall be determined and assessed by the Commissioner within five years after the return was due or was made . . ." This period was extended under the Revenue Act of 1921, November 23, 1921, c. 136, § 250 (d), 42 Stat. 227, 265–6, which provided that the amount of the tax under the 1918 Act should be "determined and assessed within five years after the return was filed, unless both the Commissioner and the taxpayer consent in writing to a later determination, assessment, and collection of the tax." [5] In each of the cases at bar, the Commissioner and the taxpayers executed, prior to March 15, 1924, an instrument called "Income and Profits Tax Waiver." The waivers stated that "In pursuance of the provisions of subdivision (d) of section 250 of the revenue act of 1921," the Commissioner and the taxpayer "consent to a determination, assessment, and collection of the amount of income, excess-profits, or war-profits taxes due under any return made. . . . This waiver is in effect from the date it is signed by the taxpayer and will remain in effect for a period of one year after the expiration of the statutory period of limitations. . ." In each case, the assessment was made more than six years after March 15, 1919, but within six years after the filing of the completed return on Form 1120. If Form 1031T was "the return" within the meaning of the above provisions as to limitation, then the assessments were made too late.

We are of opinion that the filing of the document known as Form 1031T, duly executed, did not start the running

---

[5] This period of limitation on assessments of taxes under the 1918 Act was continued in the later Revenue Acts. June 2, 1924, c. 234, §§ 277 (a) (2), 278 (c), 43 Stat. 253, 299, 300; February 26, 1926, c. 27, §§ 277 (a) (3), 278 (c), 44 Stat. 9, 58, 59.

of the period of limitation.   Form 1031T is not an instrument expressly provided for in the Act.   It is not in the nature of a " list," " schedule," or " return," commonly required by tax statutes.   It was an invention of the Commissioner designed to meet a peculiar exigency.   Its purpose was to secure to the taxpayers a needed extension of time for filing the required return, without defeating the Government's right to prompt payment of the first instalment.   As Form 1031T made no reference to income, or to deductions or credits, it could not have been intended as the return " stating specifically the items of . . . gross income, and the deductions and credits "—the return required to satisfy the statute.

Section 3182 of the Revised Statutes, U. S. C. Tit. 26, § 102, provides that the Commissioner shall " make the inquiries, determinations, and assessments of all taxes . . . and shall certify a list of such assessments . . . to the proper collectors."   Section 250 (b) of the 1918 Act required that " as soon as practicable after the return is filed, the Commissioner shall examine it.   If it then appears that the correct amount of the tax is greater or less than that shown in the return, the installments shall be recomputed."   It was to serve these purposes that § 239 required all corporations to make returns " stating specifically the items of . . . gross income and the deductions and credits."   The burden of supplying by the return the information on which assessments were to be based was thus imposed upon the taxpayer.   And, in providing that the period of limitation should begin on the date when the return was filed, rather than when it was due, the statute plainly manifested a purpose that the period was to commence only when the taxpayer had supplied this information in the prescribed manner.   Form 1120 provided for furnishing the data which would enable the Commissioner to make a determination, assessment and recomputation.   Form 1031T furnished no data which

could, in any way, aid him in that connection. It is true that even the complete return on Form 1120 need not be accepted by the Commissioner as the sole basis for the determination of the amount of the tax. Assessments are frequently based on audits of the Income Tax Unit. However, the purpose of these audits is not to eliminate the necessity of filing the return, but to safeguard against error or dishonesty.

The corporations concede that § 239 defined the nature of the return required and referred to in the several provisions of the Act, and that Form 1031T did not comply with that section; but, in support of their contention that the tentative return, Form 1031T, started the running of the period of limitation, they present the following arguments. They urge that the sufficiency of a return for the purpose of starting the period of limitations does not depend upon a strict compliance with the requirements of § 239; that the Act required but one return, that Form 1031T was a formal document prescribed by the Commissioner, called a " return " and so termed on its face, and that the complete return should, therefore, be treated as an amendment or completion of the tentative return; that Form 1031T was a sufficient return to start the period of limitation, because it was sufficient to prevent the extension of time for the payment of the first instalment of the tax pursuant to § 250 (a); because it was a sufficient return under § 250 (e) to constitute notice and demand for the payment of the first instalment; because it was a sufficient return to form the basis of an assessment, which, under the law, must be based on a return; and because it was a sufficient return to subject taxpayers to the penalties provided by § 3176 of the Revised Statutes and § 253 of the Act, for failure to file it on time.

These arguments ignore the differences in nature and purpose between Form 1031T and the return required by

the Act. The mere fact that Form 1031T was a formal document prescribed by the Commissioner and termed a " return " does not identify it as the return required by the Act. The word " return " is not a technical word of art. It may be true that the filing of a return which is defective or incomplete under § 239 is sufficient to start the running of the period of limitation; and that the filing of an amended return does not toll the period.[6] But the defective or incomplete return purports to be a specific statement of the items of income, deductions and credits in compliance with § 239. And, to have that effect, it must honestly and reasonably be intended as such. There is not a pretense of such purpose with respect to Form 1031T. Nor is it the purpose of Form 1120 to supply or correct something omitted or misstated in Form 1031T. The latter was neither defective nor incomplete. The extension of time for the payment of the first instalment was prevented, not because Form 1031T was considered a return in compliance with the statute, but because the Commissioner exacted payment as a condition for the requested extension of time to file the return. The penalties were to be imposed for the failure to file, or the late filing, of the detailed return above described. And the penalties were avoided, not by the filing of Form 1031T as a substantial compliance with the requirement of a return, but, as expressly stated in that form, by the extension of time to file which was granted " in consideration of the filing of this tentative return and the payment of not less than one-fourth of the estimated amount of the tax, and for the reasons stated." Obviously, without the payment of the first instalment.

---

[6] See Appeal of National Refining Co., 1 B. T. A. 236; Appeal of Mabel Elevator Co., 2 B. T. A. 517; *United States* v. *National Refining Co.*, 21 F. (2d) 464; *United States* v. *Mabel Elevator Co.*, 17 F. (2d) 109; *Union Pac. R. Co.* v. *Bowers*, 24 F. (2d) 788; *National Tank & Export Co.* v. *United States*, 35 F. (2d) 381.

and the consequent grant of an extension of time, the mere filing of Form 1031T would not have avoided the penalties prescribed for the late filing of the return required by the Act.[7] Nor would the penalties have been avoided by the filing of that form, if the complete return were not filed within the extended time.

The contention that because Form 1031T was sufficient as a notice and demand under § 250 (e) it was a sufficient return to start the period of limitation is equally unsound. That section did not prescribe the exclusive mode for the notice and demand for payment of the first instalment. Any instrument containing the notice and demand would be as efficacious for that purpose as the return required by the statute. Finally, the argument that Form 1031T was a sufficient return to furnish the basis for assessment lacks significance, whether or not it is sound.[8] The Commissioner is not confined to the taxpayer's return for the basis of his assessment. He may secure additional information; and he may assess the tax even if the taxpayer files no return. Rev. Stat. § 3176,

[7] Attention is called to Article 407 of Internal Revenue Regulations 45, which provided that: "In lack of a prescribed form a statement made by a taxpayer disclosing his gross income and the deductions therefrom may be accepted as a tentative return, and if filed within the prescribed time, a return so made will relieve the taxpayer from liability to penalties, provided that without unnecessary delay such a tentative return is replaced by a return made on the proper form." But obviously Form 1031T was not a tentative return within the meaning of this Article. It did not even purport to be a "statement disclosing gross income and the deductions therefrom."

[8] To sustain the argument that assessment could be made on the basis of Form 1031T, counsel cited only Matteawan v. Commissioner, 14 B. T. A. 789 and Lamborn v. Commissioner, 13 B. T. A. 177, 187. But it is not clear that in either of these cases, the assessment was in fact made on the basis of that form. In both cases there were other bases; and in both cases the Board of Tax Appeals expressly refused to comment on the propriety of assessment based on Form 1031T. See Appeal of Matteawan Mfg. Co., 4 B. T. A. 953, 956.

U. S. C. Tit. 26, § 97; Revenue Act 1918, § 250 (c). The mere fact that, in the absence of any information, the Commissioner might be compelled to assess the tax on the basis of the taxpayer's estimate, does not transform that simple estimate of the amount of the tax into the detailed return of the items of gross income, deductions, and credits required by the Act. Form 1031T was only a formal substitute for the simple letter originally planned, remitting payment and requesting an extension. That it was called "Tentative Return" is of no significance. It was termed also "Estimate Of Corporation Income And Profits Taxes And Request For Extension Of Time For Filing Return."

It has been said that the Government is assuming an inconsistent and unconscionable attitude. But there is nothing inconsistent or unconscionable in its position. The Commissioner did not represent that the date of filing Form 1031T would be treated as the beginning of the period of limitation. And it is not clear that he had the power to shorten the period prescribed by the statute. The Government has not treated Form 1031T for any purpose as the return required by the Act. The tentative return was confessedly a novel device. It imposed no hardship on taxpayers. Indeed, it enabled them to save the interest charge which otherwise would have attended an extension of time to file the return and pay the first instalment. Notice of the Commissioner's intention to assess deficiencies in stated amounts was given to the corporations much before March 15, 1925. The delay in the assessments past that date was due to negotiations with the Commissioner which resulted in the reduction of those amounts to less than half in the one case and to about one-sixth in the other. The corporations are in no position to complain of the Government's action.

*Second.* The claim that, even if the assessment was timely, the collection was barred, depends upon the effect

of the "Income and Profits Tax Waiver," and the applicability of the Revenue Acts of 1924 and 1926. As previously stated, both corporations and the Commissioner executed this instrument pursuant to § 250 (d) of the 1921 Act, prior to March 15, 1924, and consented to the determination, assessment and collection of the tax, "this waiver" to be in effect for one year after the expiration of the statutory period of limitation. Under the 1921 Act, § 250 (d), this period was five years after the return was filed. The Revenue Acts of 1924 and 1926 extended the period for collection to six years after the date of assessment; June 2, 1924, c. 234, § 278 (d), 43 Stat. 253, 300; Feb. 26, 1926, c. 27, § 278 (d), 44 Stat. 9, 59. In both cases proceedings for collection of the tax were begun more than six years after either the tentative or the complete returns were filed, but less than six years after the assessments were made. In the Florsheim case, collection was effected in 1925; in the Hood case, in 1926, after the passage of the 1926 Act.

The Government contends that the "Income and Profits Tax Waivers" executed by the corporations were waivers by them of the statutory period for another year; that while these waivers were still in force and while the corporations' liability was thus still alive, the Revenue Act of 1924 and 1926 were passed, increasing the period for collection to six years after assessment; that these Acts are applicable to the cases at bar; and that, since the collections were made within six years after the assessments, they were timely made. The corporations insist that the "Waivers" were not merely waivers extending the statutory period, but were binding contracts which limited the time in which the Commissioner could assess and collect the taxes; and that no change in the law made after the date of the contracts and enlarging the time for collection can affect their rights. They urge that the 1924 and 1926 Acts did not purport to extend the

periods thus limited by contract; and that, if construed as extending such periods, the provisions of these Acts are unconstitutional. They concede that, in the absence of contract, a legislature may constitutionally lengthen or shorten the period in which a right may be enforced by legal proceedings.

We are of opinion that the contention of the Government must prevail. The waivers executed by the parties were not contracts binding the Commissioner not to make the assessments and collections after the periods specified. At the time when the waivers were executed, the Commissioner was without power under the statute to assess or collect the taxes after the statutory period, as extended by the waivers. A promise by the Commissioner not to do what by the statute he was precluded from doing, would have been of no significance. The waivers do not purport to contain such a promise. *Bank of Commerce* v. *Rose,* 26 F. (2d) 365, 366; *Greylock Mills* v. *Commissioner,* 31 F. (2d) 655, 657. And obviously, the Commissioner did not undertake to limit the power of Congress to extend the period of limitations, as consideration for the waivers. The instruments were nothing more than what they were termed on their face—waivers; and that was all to which the Commissioner was authorized to consent.

Stress is laid on the use of the words "agree" and "agreement" in the Acts and Regulations. But these are ordinary words having no technical significance. It is also urged that, unless a contract was intended, there is no reason why the consent of the Commissioner should have been required. But an otherwise plain meaning should not be distorted merely for the sake of finding a purpose for this administrative requirement. If a reason must be found, it exists in the general desirability of the requirement as an administrative matter. It serves to keep the Commissioner in closer touch with the matters which he

is charged to administer. It avoids claims of improvident execution of waivers and unauthorized exactions by subordinates of the Department for the purpose of curing their own delinquencies. And it provides a formal procedure which is generally desirable for the Commissioner, collectors, and subordinates in the Department. That other means might have been devised for the same purpose is of no significance.

The question as to the applicability of the later Acts may be briefly disposed of. Section 1100 of the Revenue Act of 1924 repealed the 1921 Act. Section 277 (a) (2) of the 1924 Act[9] expressly dealt with taxes due under the Acts of 1918 and 1921; and it reënacted the five year limitation with the express qualification, "Except as provided in section 278." Section 278 (c)[10] reënacted the provision as to extension of time by the consent of the Commissioner and the taxpayer; and constituted the sole statutory authority for the waiver of the period of limitation for taxes due under the 1918 and 1921 Acts. It unquestionably applied to waivers thereafter to be executed; and no reason appears why it did not equally apply to waivers executed prior to the passage of the Act. Section 278 (d)[11] prescribed the period of limitation for the collection of taxes applicable to all cases enumerated in that section and § 277, which expressly included taxes under the Act of 1918. The situations intended to be excluded from the limitations prescribed were carefully specified in § 278 (e)[12]: (1) assessments

---

[9] § 277 (a) (3) of the 1926 Act.

[10] § 278 (c) of the 1926 Act.

[11] § 278 (d) of the 1926 Act.

[12] § 278 (e) of the 1926 Act. This section eliminated the second exception in § 278 (e) of the 1924 Act, stated in the text. The fact that, in the Hood case, where collection was made after the enactment of the 1926 Act, the assessment had been made previous to that time, is, therefore, immaterial.

or collections already barred before the. passage of that · Act and (2) assessments made and proceedings begun prior to that time. Neither of the cases at bar falls within those exceptions. Since, in both cases, assessment and collection were not barred on the enactment of the 1924 Act, and were made after that date, the section is applicable. Compare *Russell* v. *United States,* 278 U. S. 181. ·

It is urged that this construction of the Acts causes discrimination against taxpayers who obligingly consented to additional time for assessment and collection, and in favor of those who obdurately refused such consent or whose returns were not audited, prior to the bar of the statute, for the purpose of assessing deficiencies. That taxpayers whose returns led to no suspicion of inaccuracy prior to the expiration of the statutory period are in a preferable position is due, not to any unjust discrimination contained in the 1924 or 1926 Acts, but to the quality of their returns and to propitious circumstances. For the disobliging taxpayers, the Acts provided an alternative remedy in the so-called jeopardy assessment and demand; 1924, § 274 (d), 43 Stat. 297; 1926, § 279, 44 Stat. 59. It is urged also that the Government may not properly and consistently accept the consent contained in the "Waivers." and not be bound by the limitation. But the limitation was only on the corporations' consent; and the Government was bound thereby. The instruments contained nothing, however, which could restrict the Government's power to enlarge the statutory provisions as to limitation. The timeliness of the collection is based not upon the waivers, but upon the statutes.

*No. 118, Affirmed.*
*No. 414, Reversed.*