Albert L. VITTER, Jr. and Oliver J.
Counce, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 18244.

United States Court of Appeals
Fifth Circuit.

June 20, 1960.

Rehearing Denied Aug. 5, 1960.

---

Cameron, Circuit Judge, dissented.

George R. Blue, A. J. Schmitt, Jr., Beard, Blue & Schmitt, New Orleans, La., for appellants.

Lloyd J. Keno, Lee A. Jackson, Dept. of Justice, Washington, D. C., M. Hepburn Many, U. S. Atty., Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., Charles K. Rice, Asst. Atty. Gen., Robert N. Anderson, Atty., Dept. of Justice, Washington, D. C., Nicholas J. Gagliano, Asst. U. S. Atty., Metairie, La., for appellee.

Before RIVES, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The problem dealt with here is liability for the excise tax[1] on payment of initiation fees as a condition precedent to becoming a member of the New Orleans Country Club. There are no disputed issues of fact, and summary judgment, all agree, was a proper method of disposition of the Taxpayers'[2] refund suit. The controversy is confined to whether the District Court's decision against the Taxpayers and in favor of the Government was correct.

Not the first dues-paying-taxpaying country-club member dissatisfied with such a handicap, Taxpayer appeals on three main grounds. First, there was no payment to or for the benefit of the Club so no taxable event ever occurred. Second, to invoke this application of the statute at this late date beginning in 1953 is grossly unfair. And third, if anything is due, it should be limited to the par value of the stock ($250) not the fluctuating market prices actually paid (see note 2, supra).

For an organization whose aims reflect considerable ambitious hopes in the nonprofessional fields of athletic, intellectual, cultural and aesthetic attainments,[3]

1. The 1954 Code, 26 U.S.C.A. §§ 4241–4242, applicable to one case, and substantially identical to the 1939 Code, 26 U.S.C.A. §§ 1710–1712 (1952 Ed.) applicable to the other, provides:

"§ 4241. Imposition of tax.

"(a) Rate.—There is hereby imposed—

"(1) Dues or membership fees.—A tax equivalent to 20 percent of any amount paid as dues or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10 per year.

"(2) Initiation fees.—A tax equivalent to 20 percent of any amount paid as initiation fees to such a club or organization, if such fees amount to more than $10, or if the dues or membership fees, not including initiation fees, of an active resident annual member are in excess of $10 per year. * * *

"(b) By whom paid.— * * * the taxes imposed by this section shall be paid by the person paying such dues or fees, * * *." 26 U.S.C.A. § 4241 (1959 Supp.)

"§ 4242. Definitions.

"(a) Dues.—As used in this part the term 'dues' includes any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days; and

"(b) Initiation fees.—As used in this part the term 'initiation fees' includes any payment, contribution, or loan, required as a condition precedent to membership, whether or not any such payment, contribution, or loan is evidenced by a certificate of interest or indebtedness or

share of stock, and irrespective of the person or organization to whom paid, contributed, or loaned." 26 U.S.C.A. § 4242 (1955 ed.).

2. These are two separate suits consolidated for trial and appeal brought as test cases and stipulated to control the outcome of 80 other cases. We refer indiscriminantly to one or both plaintiffs as Taxpayer.

Counce: Purchased stock November 24, 1953, paying $1,425 plus brokerage; also paid initiation fee direct to Club, elected and admitted to regular membership February 26, 1954.

Vitter: Purchased stock February 4, 1957, paying $5,600 plus brokerage; also paid initiation fee direct to Club; elected and admitted to regular membership February 7, 1957.

3. The charter provides:

"The objects and purposes for which this corporation is established are declared to be:

"To promote and foster, and afford opportunity for, athletic and other like exercises, and such sports as Golf, Lawn Tennis, Polo, Baseball, Football, Bowling, Boating, Swimming, Sailing, Driving, Horse-back riding, Automobiling, Canoeing, Gun-practice, Rowing, Hunting, Fishing, Fencing, Gymnastics, and all other in-door and out-door social and athletic games and sports; to regulate social intercourse and amusement among its members; to promote among them refinement of manners and intellectual improvement by the establishment and maintenance of a club-house with pro-

New Orleans Country Club has at least one unique aspect. Stock in the Club, indispensable to regular membership, is regularly traded in as a security in the over-the-counter stock market of New Orleans. There, as in the case of stock of local banks and other business enterprises not listed on a national exchange, the price rises and falls as "Bid" and "Asked" make the current market.

Therein lies the nub of the green. For this in turn seems to stem from the unusual fact that under the Club's charter it is not necessary that a regular member *own* a share of stock—he need only be the *holder* of it. Stock may therefore be owned by a non-member. And a member may be a non-stockholder. This gives the stock a speculative marketability in terms of possible appreciation in value unrestricted, as in the case of most lodges or clubs, to a select or approved group of persons as potential buyers. It is entirely possible then that one could buy a share of NOCC stock with no intention of ever being a member, or for that matter, with the certainty that from personality traits, business associations, past personal moral record, or similar considerations, the purchaser could never become a member.[4]

But such is not our case. Taxpayer, in his desire to become a regular member purchased a share of stock in order to qualify himself as an applicant and obtain election to membership. To do so, Taxpayer bought the stock in the open market at its market value, note 2, supra.

While this unique marketability does reflect an economic value giving the stock some attributes of a commercial investment, the charter makes clear that except for its potential appreciation for sale to one desiring membership, it has no real worth apart from enjoyment of the Club's facilities by a member holding it. The stock is subject "to pro rata assessment at the direction of the Board of Governors for the purpose of paying the necessary initial and running expenses of the Club * * *." And "on failure of any stockholder to pay any assessment levied by the Board of Governors * * * on the share or shares held by him * * *," such stock is subject to sale with the proceeds thereof to "be applied to the payment of all unpaid assessments due by said share of stock * * *." Even more critical, this lien with right of sale expressly covers "other indebtedness due to the Club by the member in whose name [the stock] stands * * *." And while, as indicated above, the stock is traded in on the open market, the sale might not be effective since no share of stock can be transferred "until all past due and unpaid assessments, and other indebtedness, are paid in full."

Thus the stockholder has, for a corporate investment, an "asset" of continuing liability, not the usual nonliability. From an economic point of view, the charter's own language plainly sets forth that the "only right to be enjoyed by a shareholder who is not also a member shall be the right * * * to receive his pro rata share of the assets" in the event of dissolution of the corporation. Even in this he has limited rights because, as a non-member-stockholder, he

visions for out-door and in-door games and sports, by an accumulation of well-assorted and standard books and periodicals, and to these ends, to buy, sell, erect, hold, lease, or otherwise acquire, and to convey or otherwise alienate and dispose of, and to maintain and operate one or more club-houses and appurtenances, including grounds, out-houses, golf links, tennis courts, boat houses, garages, hangars, wharves, stables, hitching sheds, cafes and refreshment rooms, polo field, bowling alleys, athletic grounds, shoot-

ing ranges, gymnasium, natatorium, and all other necessary paraphernalia and equipment incidental to the carrying on of the sports above enumerated, and kindred out-door and in-door sports and games."

4. Included within such category and without any moral aspersions would be corporate purchasers who, as inanimates, could never ride a horse, sink a putt, return a volley, read a well assorted book, or enjoy the other fruits of membership described in note 3, supra.

cannot vote on any matter concerning either current operations or dissolution. What stock ownership lacks in an economic sense is even more glaringly absent concerning non-financial, personal enjoyment. The charter expressly provides that "ownership of one or more shares of the capital stock of this corporation shall not confer upon the holder any of the rights or privileges of membership." Nor, except from a vantage point off the premises could he even look at or examine the properties an aliquot portion of which he might sometime receive in distribution if others so voted. The broad denial of membership privileges is explicitly spelled out. Stock ownership shall not "include the right to vote on any question or to use or go upon the property or assets of the organization, unless, in addition, the said holder shall have been duly elected a member of this organization in the manner" prescribed.

On the other hand, while the stock has slight economic benefits and none for enjoyment, it is indispensable to membership. The charter-authorized By-Laws prescribe that a regular member must be the holder of a share of stock.[5] Neither the charter nor the by-laws prescribe how the stock should be obtained, and it is uncontradicted that such stock is frequently transferred by gift, devise or inheritance. A regular member in addition to being the holder of a share of stock is at the time of his election also required to pay directly to the Club a sum fixed and described as an initiation fee.

■ The one thing in this case as obvious as a water hazard is that for Taxpayer to achieve the status of a regular member of NOCC, he had to hold a share of stock. He did not own one. Presumably he could not borrow, lease or beg one. In any event he held the stock by buying it. In a real sense, then, this, in the words of the statute was "required as a condition precedent to membership." 26 U.S.C.A. § 4242(b), note 1, supra.

Taxpayer does not really dispute this, nor could he. But, he insists, such candid realism neither produces a stymie nor puts him irretrievably in a bunker. This is so, he contends, because there is a conflict between § 4241 and § 4242, note 1, supra. He reasons it this way. The tax prescribed in § 4241 is imposed on a percentage of "any amount *paid* as initiation fees *to* * * * a club." Here there was no payment *to* the Club. The payment was to the former stock owner. On the other hand, § 4242(b) undertakes to impose the tax "irrespective of the person or organization to whom [such initiation fee is] paid, contributed, or loaned." The conclusion is then asserted that since the tax imposing provision prescribes one recipient and the next section in general terms another, there is a conflict requiring construction favorable to the precise provision and, incidentally, to the Taxpayer.

■■ But this is an artificial cutting up of a single statute into several unrelated parts, not a reading of it together as a whole. The second part, § 4242, is not separate. Indeed, its topic head as "Definitions" shows a congressional purpose to read all stated in § 4242 as though it were physically written into § 4241. As reconstructed its meaning is substantially this. There is imposed a 20% tax on any amount paid, contributed or loaned as a condition precedent to membership in a club irrespective of the person or organization to whom such payment, contribution or loan is made and whether that which is received for such payment, contribution or loan is evidenced by a certificate of interest or indebtedness or share of stock.

---

5. "2. The several classes of membership in the Club shall be as follows:

"A) Regular Membership—Shall consist of persons of legal age, who are registered holders of at least one share of the capital stock of the Club."

In the amendments [6] which eventuated in the statute, note 1, Congress was intending to plug not only demonstrated loopholes,[7] but to make certain that whatever device was followed, if the payment was actually essential to becoming eligible for membership in a club, that payment, by whatever form, was both the taxable event and a determination of its amount.

■■ Payments made to the former owner of stock to comply with the club's requirement that a member be a stockholder have uniformly been held to be within the broad definition of "initiation fees." Munn v. Bowers, 2 Cir., 1931, 47 F.2d 204; Knollwood Club v. United States, 1931, 48 F.2d 971, 94 Ct.Cl. 1; Wild Wing Lodge v. Blacklidge, 7 Cir., 1932, 59 F.2d 421. In none was the payment either to or for the benefit of the club. This approach is reflected by the regulations [8] which, unchanged after many years, have received the implied congressional imprimatur from continued acquiescence.[9]

■ Having progressed this far on the course, the other two objections take little treatment. The complaint is that since the tax was not asserted against persons acquiring stock of NOCC from 1930 through 1953 (when the Collector commenced his assessments), it is unfair. Apparently this is so for two reasons. First, when the heavy hand of the Tax Collector fell, it depressed the resale market value in substantially like amounts. Second, the newer members have had to incur additional costs which earlier members escaped. But whatever the reason, it cannot prevail here with us. Ours is a narrow function to interpret, not make, the law. If suffering this economic penalty of loss of stroke and distance from this inequitable unplayable lie is too severe, relief may not come from the umpire. The rules have first to be changed, and Congress may alone do that.

6. This is traced in Munn v. Bowers, 2 Cir., 1931, 47 F.2d 204–205, certiorari denied, 283 U.S. 845, 51 S.Ct. 492, 75 L.Ed. 1454.

7. Typical of these the Taxpayer points to Lukens v. United States, 1926, 62 Ct.Cl. 598; Alliance Country Club v. United States, 1926, 62 Ct.Cl. 579; Page v. United States, 1926, 62 Ct.Cl. 590; Masonic Country Club v. Holden, 6 Cir., 1927, 18 F.2d 553. See also Senate Rpt. on Public Bills, 70th Cong. 1st Sess., p. 34.

8. The applicable regulation carries forward without changes of wording the regulation initially adopted. See Knollwood Club v. United States, 1931, 48 F.2d 971 at page 972, 94 Ct.Cl. 1.

"It is not material whether the applicant has any hope or expectation of a return of his payment upon resignation, death, or other circumstances, nor is it material to whom he pays the money. For instance, if a golf club requires incoming members as a condition precedent to membership to purchase either from it or from retiring members a share of stock, the tax attaches to any such payment for the stock regardless of the fact that it represents a property interest in the assets of the club. Likewise, if the purchase of a share of stock in a landholding corporation is a necessary precedent to membership in the club, the amount paid for such share of stock is taxable. * * *." Treasury Reg. 43 (1941) § 101.28.

9. When a Treasury Regulation interprets a section of the Code and the Regulation remains in effect and unchanged for a long period of time, re-enactment of the statute without change is presumed to show congressional approval of the Regulation which thereby acquires the force and effect of law. Commissioner v. Flowers, 1946, 326 U.S. 465, 469, 66 S.Ct. 250, 90 L.Ed. 203, 207; Boehm v. Commissioner, 1945, 326 U.S. 287, 291–292, 66 S.Ct. 120, 90 L.Ed. 78; Helvering v. R. J. Reynolds Tobacco Co., 1939, 306 U.S. 110, 114–115, 59 S.Ct. 423, 83 L. Ed. 536, 540–541; White v. United States, 1938, 305 U.S. 281, 291, 59 S.Ct. 179, 83 L.Ed. 172, 178–179; Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52, 55; Cammarano v. United States, 1959, 358 U.S. 498, 510, 79 S.Ct. 524, 3 L.Ed.2d 462, 470; Jones' Estate v. Commissioner, 5 Cir., 1942, 127 F.2d 231, 232; Commissioner v. West Production Co., 5 Cir., 1941, 121 F.2d 9, 12; cf. Estate of Woodward v. Commissioner, 24 T.C. 883, 890, affirmed sub. nom. Barnhill v. Commissioner, 5 Cir., 1957, 241 F.2d 496, 499.

The remaining argument that the tax should be computed on the par value ($250) simply ignores the nature of the tax. It is not on the acquisition of the stock or the value of the stock. It is an excise tax on the *payment* required to obtain the stock as a qualification for membership. What is *paid,* not what is obtained, is the measure of the tax.

Affirmed.

CAMERON, Circuit Judge, dissents.