**Angus McDONALD, Plaintiff-Appellant,**
**v.**
**UNITED STATES of America,**
**Defendant-Appellee.**
**No. 14765.**

United States Court of Appeals
Sixth Circuit.
April 6, 1963.

Nathan Elliott, Jr., Lexington, Ky.,
for appellant.

Crombie D. Garrett, Dept. of Justice,
Washington, D. C., for appellee.

Louis F. Oberdorfer, Asst. Atty. Gen.,
Lee A. Jackson, Robert N. Anderson,
Charles B. E. Freeman, Attys., Dept. of
Justice, Washington, D. C., Bernard T.
Moynahan, Jr., U. S. Atty., Lexington,
Ky., on the brief.

Before WEICK and O'SULLIVAN,
Circuit Judges, and LEVIN, District
Judge.

O'SULLIVAN, Circuit Judge.

Angus McDonald, plaintiff-appellant,
appeals from a District Court judgment
dismissing his action to recover a fed-
eral excise tax paid by him. The tax
was a 20% levy on a $1,000.00 bond pur-
chased by him in 1947 from the Idle Hour
Country Club of Lexington, Kentucky.
The government claimed that the amount
paid for the bond was "an initiation fee"

subject to the tax assessed by virtue of § 1710(a) (2) and § 1712(b) of the Internal Revenue Code of 1939.[1]

McDonald purchased the bond in 1947; the Commissioner assessed the tax in 1960. McDonald denies liability for the tax on two grounds: First, that the $1,000.00 paid for the bond was not an "initiation fee"; and, second, that the assessment is barred by the four year limitation provided in § 3312(a) of the 1939 Code. The government asserts that the limitation provided in § 3312(a) was tolled for "failure to file a return" (§ 3312(b), I.R.C.1939).

1. *Did the bond purchased amount to payment of an initiation fee?*

The Idle Hour Country Club was organized as a Kentucky Corporation in 1946. Pertinent parts of its Articles of Association are set forth below.[2]

[1] "§ 1710. *Tax*
"(a) *Rate.* There shall be levied, assessed, collected and paid—
"(2) *Initiation fees.* A tax equivalent to 20 per centum of any amount paid as initiation fees to such a club or organization * * *.
"(b) *By whom paid.* The taxes imposed by subdivision (a) shall be paid by the person paying such * * * fees * * *."

"§ 1712. *Definitions*
"As used in this subchapter * * *
"(b) *Initiation fees.* The term "initiation fees" includes any payment, contribution, or loan, required as a condition precedent to membership, whether or not any such payment, contribution or loan is evidenced by a certificate of interest or indebtedness or share of stock, and irrespective of the person or organization to whom paid, contributed or loaned."

[2] "Article V.
"The affairs of the corporation shall be managed by a Board of Governors consisting of nine (9) members, each of whom must be the owner and holder of a Certificate of Membership * * *.
"Article VI.
"There shall be no capital stock of the corporation, but the corporation shall be empowered to issue not more than 350 Certificates of Membership. The purchasers and holders of not less than $1,000.00 face amount of the first mortgage, three per cent bonds, when, as and if issued by the corporation shall be entitled to one Certificate of Membership, and the remaining Certificates of Membership shall be held by the corporation and shall be issued by it from time to time for such consideration as the Board of Governors may determine. Not more than one Certificate of Membership shall be issued to or held by any one person.
"A Certificate of Membership shall entitle the owner and holder thereof to all of the privileges of Idle Hour Country Club, subject to the bylaws and rules and regulations as may be adopted from time to time by the Board of Governors.

"Each certificate shall show on its face either the total amount of first mortgage bonds of the corporation subscribed and paid for by the holder of such certificate or in the event the holder has paid cash for such certificate, instead of purchasing bonds of the corporation, then the total amount of cash paid the corporation by the holder for such certificate. In the event of the dissolution of the corporation, voluntary or otherwise, then after the payment of all indebtedness of the corporation, including all bonds issued and outstanding, any property or money remaining in the hands of the corporation shall be divided pro rata among the then holders of Certificates of Membership so that the holder of each Certificate of Membership shall be entitled to receive an amount equal to the proportion which the total amount of principal of first mortgage bonds subscribed and paid for by such holder, or the total amount of the consideration paid to the corporation by such holder, as appears on the face of the certificate, bears to the total principal amount of first mortgage bonds issued at any time prior to dissolution of the corporation, plus the total cash received by the corporation for all Certificates of Membership issued by it.
"Holders of Certificates of Membership shall pay dues from time to time as shall be prescribed by the bylaws of the corporation. Certificates of Membership may be transferred by the owners and holders thereof by and with the consent of the Board of Governors.
"Article VII.
"The Board of Governors of the Corporation shall have the right at any time in its discretion, without submitting said question to the holders of Certificates of Membership, to issue bonds in the name of the corporation not exceeding $350,000.00, to cause to be executed a mortgage on all of the assets of the corporation to secure the payment of same, and to

The Club's bylaws established the following classes of membership: Certificate Members, Associate Members, Intermediate Members, Junior Members, Non-resident Members and Special Members. Certificate Members were described by Section 1–A of the bylaws as follows:

> "Certificate members shall be persons who are elected by the Board of Governors and who personally own a membership certificate in the Idle Hour Country Club and who pay the dues fixed by the Board of Governors for such members. Exclusive voting privileges shall be vested in the Certificate Members."

It is apparent from the stipulated facts that the issuance of bonds, as authorized by Article VII, was a part of the original plan of the Club's organization. The bond purchased by McDonald was issued as of December 1, 1946, and he purchased it in 1947. By his purchase, he received a Certificate of Membership in the club. It was stipulated that no Certificate of Membership (Class A) has ever been issued by the Club except to a holder of one of the first mortgage bonds. Although Article VI provided that any Certificates of Membership, within the fixed limit of 350, not taken up by bond purchasers, "shall be issued by it (the corporation) from time to time for such consideration as the Board of Governors may determine" it is apparent that no plan was ever devised for admitting anyone to Class A membership except through the purchase of a bond. McDonald's bond, with others, was secured by a mortgage on the Club's assets, had a maturity date (December 1, 1996) and carried non-cumulative contingent interest. No interest has ever been paid. We think that any view of the substance of what was done discloses that the only way McDonald could become a Certificate Member (Bylaws, §§ 1, A) in the Club was by the purchase of a bond—making

a loan to it. Because by statutory definition an initiation fee "includes any payment * * * or loan, required as a condition precedent to membership," we are of the opinion that the 20% excise levy was payable on the $1,000.00 which McDonald paid for his bond.

Prior to the Revenue Act of 1928, which, by its § 413, amended the predecessor to § 1712 of the 1939 Code, it was held by this court in Masonic Country Club of Western Michigan v. Holden, 18 F.2d 553 (C.A.6, 1927), that the purchase of a share of stock which granted the privilege of club membership was not a taxable initiation fee. We there approved like holdings of the Court of Claims in the cases of Alliance Country Club v. United States, 62 C.Cl. 579; Page v. United States, 62 C.Cl. 590; Lukens v. United States, 62 C.Cl. 598. At the time of these decisions, the Revenue Code merely provided for an excise tax on an amount paid to a club "as an initiation fee." The Code did not define that term. The amendment in the 1928 Act, carried forward into § 1712(b) of the 1939 Code, specifically included "any payment, contribution, *or loan required as a condition precedent to membership*" within the term "initiation fee." Our Masonic Country Club decision cannot, therefore, be considered applicable under the Code as now written.

■ We find no decision which considered a plan of club organization and membership fitting precisely the one involved here. However, since 1928 it has been held that where ownership of a share of stock is necessary to membership in a club, the amount paid therefor is subject to the excise levy. Vitter v. United States, 279 F.2d 445, (C.A.5, 1960) cert. denied 364 U.S. 928, 81 S.Ct. 353, 5 L.Ed.2d 266; Munn v. Bowers, 47 F.2d 204 (C.A.2, 1931); Knollwood Club v. United States, 48 F.2d 971, 74 Ct.Cl. 1 (C.Cl., 1931); Wild Wing Lodge v. Blacklidge, 59 F.2d 421 (C.A.7, 1932).

sell same for the corporation, or to pledge said bonds as collateral to secure debts of the corporation. All terms and conditions of said bonds shall be prescribed by the Board of Governors of the corporation, but the same shall not be sold for less than par."

We do not consider the case of United States v. Riverlake Country Club, Inc., 306 F.2d 564 (C.A.5, 1962) to be contrary to our conclusion.

It is asserted that, because there were other classes of membership in the Idle Hour Club, for some of which McDonald might have qualified without buying a bond, the purchase of a bond was not a condition precedent to membership. McDonald, however, chose to become a full fledged Class A member with voting and ownership rights, and paid what he had to pay for these privileges. We agree with the Treasury interpretation of its Regulation that "it is not material to the application of the tax that the payment be a prerequisite *to all classes of membership* in the club. The essential question is whether such a payment is made as a prerequisite for any type of membership therein." (S.T. 387, 1–2 Cum. Bull. 291 (1922))

2. *Was the assessment barred by the statute of limitations?*

█ McDonald purchased the bond in 1947. The Commissioner assessed the 20% levy thereon thirteen years later, May 6, 1960. The Commissioner concedes that there was no fraud committed by McDonald or his Club in failing to pay or collect the tax. The taxpayer asserts that the assessment in question was barred by § 3312 of I.R.C.1939, which (excluding income and some other specified taxes), in subparagraph (a), provides that:

"All internal revenue taxes shall * * * be assessed within four years after such taxes become due * * *."

The government claims that no return reporting the taxable event which gave rise to the tax was ever made and, therefore, the above limitation does not apply.

It relies on subparagraph (b) of said § 3312, which provides that:

"In case of * * * failure to file a return within the time required by law, the tax may be assessed * * * at any time."

By § 1710(b) set out in note 1 above, it was McDonald's duty to pay the tax. By § 1715(a),[3] it was the duty of the Idle Hour Club to collect the tax. The time and place for remitting such taxes is provided in subparagraphs (b) and (c) of § 1715. By § 1716,[4] the Idle Hour Club, as the collecting agent, was likewise required to make the excise tax return. The time and place for making such returns are specified in subparagraphs (b) and (c) of said § 1716. The record in this case does not disclose any regulation adopted by the Commissioner specifying just what the return required by § 1716(a) is to contain. The excise tax return form provided (Treasury Dept. Form 729), however, contains some general instructions and quotes the § 1712 definition of club "dues." No reference is made to the statutory definition of "initiation fees."

In 1947, the month in which it received the $1,000.00 for McDonald's bond purchase, the Idle Hour Club made and filed a timely excise tax report, using the form provided by the government (Treasury Department Form 729) for making a report of "Tax on Admissions, Dues and Cabarets, Roof Gardens, etc." Under a column headed "Character of Tax" spaces are provided for reporting taxes collected for (g) Club dues and (h) Club initiation fees. While the report made showed amounts collected for club dues and initiation fees, neither the $1,000.00 received from McDonald nor a tax thereon was included in the report. Such items were not disclosed in the return because neither the club nor Mc-

---

3. "§ 1715. *Payment of Tax*

"(a) *Collection by recipient of admissions, dues, and fees.* Every person receiving any payments for admission, dues, or fees, subject to the tax imposed by section * * * 1710 shall collect the amount thereof from the person making such payments. * * * "

4. "§ 1716. *Returns*

"(a) *Requirement.* Every person required * * * to collect the taxes * * * shall make returns * * * in such manner and containing such information as the Commissioner * * * may, by regulation, prescribe."

Donald considered that the $1,000.00 paid was subject to an excise tax.

The limitation statute before us (§ 3312) is different than that applying to income taxes (§ 275, 276 I.R.C.1939). In the latter case, the filing of a return *begins* the period of limitation; the taxes must be assessed "within three years *after* the return was filed." The filing of a return starts the running of the statute. Not so in the case of excise taxes. The assessment must be made "within four years *after such taxes become due,*" provided a "return" was timely filed.

Clear guidance as to what will be held to be a valid return to *start* the running of the statute in *income tax* cases cannot be obtained from decided cases (see annotation 3 A.L.R.2d 647), but it may be said generally that the return must comply with the requirements prescribed by the Commissioner. Lucas v. Pilliod Lumber Co., 281 U.S. 245, 50 S.Ct. 297, 74 L.Ed. 829; Florsheim Bros. Drygoods Co. v. United States, 280 U.S. 453, 50 S.Ct. 215, 74 L.Ed. 542; Commissioner v. Lane-Wells Co., 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684; John D. Alkire Investment Co. v. Nicholas, 114 F.2d 607 (C.A.10, 1940); Paso Robles Mercantile Co. v. Commissioner, 33 F.2d 653 (C.A.9, 1929); National Contracting Co. v. Commissioner, 105 F.2d 488 (C.A.8, 1939). This is not to say, however, that perfect accuracy and completeness are essential to meeting such requirements.

"Perfect accuracy or completeness is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such (Lucas v. Pilliod Lumber Co., 281 U.S. 245 [50 S.Ct. 297, 74 L.Ed. 829, 67 A. L.R. 1350]), and evinces an honest and genuine endeavor to satisfy the law. This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary." Zellerbach Paper Co. v. Helvering, 293 U.S. 172, 180, 55 S.Ct. 127, 131, 79 L.Ed. 264, 269.

It is obvious, also, that if a complete and perfect return was required, there would be no purpose of having a statute of limitations. Myles Salt Co. v. Commissioner, 49 F.2d 232 (C.A.5, 1931); Isaac Goldman Co. v. Burnet, 60 App. D.C. 265, 51 F.2d 427 (1931); Valentine-Clark Co. v. Commissioner, 52 F.2d 346 (C.A.8, 1931). That Congress did not intend to require perfect accuracy is clear from its merely extending the period of limitations where there is omitted from gross income an amount, properly subject to income tax, in excess of 25% of the amount stated in the return. (§ 275(c) I.R.C.1939.)

The government here contends that excise taxes and income taxes are so dissimilar in nature that we may not employ the reasoning of decisions involving income taxes to find an answer to the question before us. It points out that an income tax is a tax on a net taxable amount computed on the basis of many events occurring during a tax period, usually one year. The amount of such a tax cannot be known until many matters have been considered—deductions, exemptions, marital status, carryovers, carrybacks and many other things. Each receipt of money or money's worth does not by itself determine its tax consequences. Conversely, the government argues, an excise tax becomes a taxable event as soon as any money is paid which is subject to the tax—the rate of tax never varies, there are no exemptions or deductions to be considered. Therefore, it argues that there can be no return of such tax unless the taxable event is itself reported. The fact that the Commissioner adopts monthly periods for convenient reporting instead of a separate report for each tax, will not permit a return which fails to disclose an event which calls for imposition of the tax to qualify as a return which will prevent a suspension of the limitation statute. We are constrained to agree with the government's position. If, without paying an excise tax, the Club

had reported its receipt of the bond purchase price, asserting its, or McDonald's claim that no tax was payable, a different question would be presented.

 Having in mind the admitted good faith of McDonald and his Club, and the thirteen years that the government delayed in making the assessment, it would appear that our holding frustrates the traditional purpose of a limitations statute. Such statutes seek repose "designed to protect the citizens from stale and vexatious claims * * *." Guaranty Trust Co. v. United States, 304 U.S. 126, 136, 58 S.Ct. 785, 790, 82 L. Ed. 1224, 1230; 34 Am.Jur. "Limitation of Actions" § 10; Mertens "Law of Federal Income Taxation" Vol. 10, § 57.13. Under the view we express, the door is open for the government to go back, without limit in time, and make assessments against citizens who honestly believed they had made all the returns and paid all the taxes that the law required. We may not, however, extend the statute here involved beyond its clear language. The good faith of the taxpayer in failing to file a return cannot aid them here. Commissioner v. Lane-Wells Co., 321 U.S. 219, 220, 64 S.Ct. 511, 512, 88 L.Ed. 684, 685. Statutes of limitations barring collection of taxes, liability for which did accrue, are strictly construed in favor of the government (Pacific Coast Steel Co. v. McLaughlin, 61 F.2d 73, 75 (C.A.9, 1932)), and their applicability will not be presumed in the absence of clear congressional action. Loewer Realty Co. v. Anderson, 31 F.2d 268, 269 (C.A.2, 1929); Bowers v. New York & Albany Lighterage Co., 273 U.S. 346, 349, 47 S.Ct. 389, 390, 71 L.Ed. 676, 677. The absence of any limitation, under the situation before us, may indeed visit unfair burdens and expense upon innocent taxpayers. If so, Congress can provide the needed remedy.

The government here relies upon the case of Peoples Outfitting Co. v. United States, 58 F.2d 847, 74 Ct.Cl. 419 (1932). While that case appears to support our conclusion, it has the distinguishing fact that the taxpayer was there found to be guilty of fraud in failing to make a return.

The District Judge in this case correctly held that there was no return filed and, therefore, the limitations statute did not apply.

Judgment affirmed.

LEVIN, District Judge (dissenting).

I respectfully dissent from the interpretation of the applicable statute of limitations, 1939 I.R.C. § 3312. The Court today in effect holds that a composite return on a form prescribed by the Commissioner pursuant to 1939 I.R.C. § 1716(a) constitutes in legal contemplation a series of separate returns, each of which covers a single taxable item. Consequently, under this holding, the failure to report a taxable item in a composite return constitutes a failure to file a "return" within the meaning of 1939 I.R.C. § 3312(b), which tolls the excise tax statute of limitations until a "return" has been filed.

A composite return, according to the rationale of the opinion of the Court, must be completely accurate in order to start the running of the statute of limitations on all transactions occurring during the period covered by the return.

The Court concedes that a good faith income tax return, although erroneously excluding certain includable items of income, nevertheless suffices to start the running of the income tax statute of limitations. But in refusing to apply that good faith rule to the excise tax statute of limitations, the Court holds that no statute of limitations applies to unreported taxable items erroneously omitted from a composite excise tax return.

Federal excise taxes apply to innumerable goods and services. Literally hun-

dreds of other particular items, otherwise taxable, might arguably fall within the many statutory exemptions of various classes of such items. See 26 U.S. C.A. §§ 4001–5801.

Even excise tax experts might disagree as to whether particular items are taxable. For example, the determination of whether the instant bonds are taxable has required a formal opinion by the District Court and a full discussion by this Court. The annotations to the excise tax provisions in Volume 26 of the United States Code Annotated refer to hundreds of decisions determining the taxability of particular goods and services. Yet the Court holds that the filing of a composite return does not start the running of the statute of limitations as to the transactions occurring within the period covered by that composite return unless that return reports every single transaction which might at any future time be held to be taxable.

No practical distinction flows from the variance between the language of the income tax statute of limitations and the excise tax statute of limitations. An income tax return filed prior to the last day for filing is deemed to have been filed on that last day (1939 I.R.C. § 275 (f)), which happens to be the same day on which payment is due (1939 I.R.C. §§ 53, 56). Thus, like the excise tax statute of limitations (1939 I.R.C. § 3312), the income tax statute of limitations begins to run on the day the taxes become due.

I would hold that the filing of a composite return erroneously omitting certain items in good faith constitutes the filing of a "return" within the meaning of 1939 I.R.C. § 3312(b) and, consequently, the filing of such a good faith return suffices to start the running of the statute of limitations on those erroneously omitted items.