In re Randall Dee LAMBORN and
Teresa Marie Lamborn,
Debtors.

Randall Dee LAMBORN and Teresa
Marie Lamborn, Plaintiffs,

v.

The UNITED STATES of America ex rel.
INTERNAL REVENUE SERVICE;
State of Oklahoma ex rel. Oklahoma
Tax Commission, Defendants.

Bankruptcy No. 93–02338–W.
Adv. No. 93–0251–W.

United States Bankruptcy Court,
N.D. Oklahoma.

Jan. 31, 1997.

John M. Hickey, Tulsa, OK, for plaintiffs.

J.I.M. Caldwell, Oklahoma City, OK, for Defendants.

### ORDER DENYING
### "MOTION FOR A NEW TRIAL ..."

MICKEY DAN WILSON, Chief Judge.

On April 26, 1995, this Court issued its "Memorandum Opinion and Order" in this adversary proceeding, now published as *In re Lamborn*, 181 B.R. 98 (B.C., N.D.Okl.1995) (hereinafter *"Lamborn I "*). Said order, with its findings of fact and conclusions of law, is adopted and incorporated herein by reference. Said order directed that judgment issue for defendant State of Oklahoma ex rel. Oklahoma Tax Commission ("OTC"). On May 8, 1995, plaintiffs Randall Dee and Teresa Marie Lamborn ("debtors") filed their "Motion for a New Trial or, in the Alternative, Motion for Reconsideration [or] to Alter or Amend Judgment" ("the motion to reconsider"). On May 23, 1995, OTC filed its "Response ..." thereto. The motion to reconsider was to be decided together with similar issues in another, otherwise unrelated matter, namely Adv. No. 94–0309–W James v. U.S.A. and State of Oklahoma in Case No. 94–02211–W In re James, David S. and Carol R. However, the James matter later settled, leaving the motion to reconsider herein to be determined separately. Upon consideration of the record in this case and adversary proceeding and (as appropriate) in the James case and adversary proceeding, this Court determines, concludes and orders as follows.

The general issue is whether certain tax debts are excepted from discharge under 11 U.S.C. § 523(a)(1)(A). To determine whether a tax debt is excepted from discharge, § 523(a)(1)(A) adopts the same standards used to determine certain tax priorities under 11 U.S.C. § 507(a)(7)(A). (Section 507(a)(7) has since been renumbered § 507(a)(8); references herein are to the earlier number.) Debtors argue that their tax debts are not entitled to priority under § 507(a)(8)(A)(i), (ii) and (iii), and are therefore also not excepted from discharge under § 523(a)(1)(A), for various reasons which form the specific issues herein. For initial discussion of these issues, see *Lamborn I*, supra.

In *Lamborn I*, this Court ruled that 68 O.S. § 2375(H)(2) "requires" a return for purposes of 11 U.S.C. § 507(a)(8)(A)(i), even though it allows taxpayers the option of filing a formal or informal return. Debtors seek reconsideration because, they assert, this Court has misunderstood their argument regarding whether 68 O.S. § 2375(H)(2) "requires" a return within the meaning of 11 U.S.C. § 507(a)(8)(A)(i). Debtors argue that they really do not have the power to choose whether their tax debt survives bankruptcy; and point out that they themselves filed a "formal," not an "informal," return. It is true that, under the facts in this case, debtors did not choose to file an "informal" return in an attempt to render their taxes dischargeable (although debtors' theory, if adopted, would suggest such an option). Strictly speaking, therefore, this case involves, not the debtors' choice between the options of formal and informal returns, but the State's choice of whether to allow debtors the options of formal and informal returns; see *Lamborn I*, 181 B.R. p. 102, 2nd col., lines 18–28. However, the main point of *Lamborn I* remains valid—namely, that

> It is clear that 68 O.S. § 2375(H)(2) *requires* debtors to submit to OTC either a formal amended return or a letter acting as a substitute therefor. Therefore a "return," loosely defined, is "required" for purposes of [11 U.S.C.] § 507(a)(8)(A)(i),

*id.* pp. 102–103. Debtors do not persuade the Court that its broad reading of the term "return" is erroneous.

Given that a return is "required" such that § 507(a)(8)(A)(i) applies, debtors propose that the three-year period which determines priority under § 507(a)(8)(A)(i), and therefore also nondischargeability under § 523(a)(1)(A), "relate[s] to the filing of the **original** returns and not the amended returns", motion to reconsider p. 11 (emphasis original). That is, debtors propose that the priority/nondischargeability period on taxes disclosed in an *amended* tax return should commence when the *original* tax return was filed, even though this would discharge debtors' tax liability on the *amended* return, even before such amended return had been filed. Debtors adopt cases and briefing in the

James matter. The Court considers such cases and briefing herein, notwithstanding settlement of the James matter itself; and discusses them at length in the following paragraphs.

Debtors ask this Court to rule that the priority period for tax collection starts running when an original tax return is filed, even if a later amended return discloses that additional taxes are (or should have been) owing. Any such rule would be, to put it mildly, a peculiar one—tantamount to ruling that a creditor may lose his right to collect a debt even before he knows the debt was collectible. Yet debtors say such rule is established by a number of cases. This Court has carefully considered these cases, and concludes that all of them are distinguishable.

None of these cases concern Federal bankruptcy laws such as 11 U.S.C. § 523(a)(1)(A) or § 507(a)(7)(A). Debtors' cases are applied to the bankruptcy statutes by analogy; the cases actually deal with the period of limitation for assessment or collection of taxes under various Federal tax statutes. Many of these cases share a peculiar background in the events of the "roaring twenties". All of them deal with peculiar situations, in the 1920's and later. Hence their peculiar rulings.

The American war debt for the First World War provoked a series of new income tax and excess-profits tax acts, including some rather slapdash measures for getting funds into government coffers as quickly as possible. The Revenue Act of 1918 was enacted in February 1919; it gave corporate taxpayers only 3 weeks after enactment to file returns for tax year 1918. In an attempt to ease the pressure on taxpayers, the Bureau of Internal Revenue created a procedure for filing a "tentative return", to be followed after a decent interval by a "completed return". Matters seemed to settle down during tax years 1919–1920. But on November 23, 1921, the Revenue Act of 1921 became law; and Congress made it retroactive to January 1, 1921. The retroactivity meant that some taxpayers, who had correctly figured their taxes for tax year 1920 under the 1918 Revenue Act, would have to refigure them under the 1921 Revenue Act. The Bureau instructed taxpayers to file no new returns if they owed no new taxes, but to file "a new or supplemental return" if they owed new taxes under the new 1921 Revenue Act. Another Revenue Act was passed in 1924—and another on February 26, 1926, retroactive to January 1, 1925. These singular events generated litigation.

In *U.S. v. Mabel Elevator*, 17 F.2d 109 (D.Minn.1925) ("*Mabel*"), a snafu in the transition period under the 1918 Revenue Act left the taxpayer owing a deficiency for a 5-month period. The taxpayer filed a series of returns, all for fiscal years; but the Bureau insisted on calendar-year returns. The issue was not whether the later returns tolled the limitation period; the Bureau disregarded *all* of the returns, including the initial one. The Bureau argued that every one of these returns, including the initial one, was rendered a "nullity" by its failure to conform to Bureau standards; and was insufficient to start the limitation period running in the first place. The District Court rejected the Bureau's argument.

> Otherwise, there would practically be no period of limitation whatsoever, and every man who made an inaccurate return could have a deficiency assessed against him at any time, because an inaccurate return is not a return made strictly in compliance with the law,

*id.* 17 F.2d p. 110.

In *Union Pacific R. Co. v. Bowers*, 24 F.2d 788 (2nd Circ.1928) ("*Bowers*"), a taxpayer filed an original return, then discovered an error and volunteered an amended return showing an additional tax of $413,724. The Bureau demanded interest on this already-considerable sum from the date of the original return. The 2nd Circuit panel, by Judges Learned and Augustus Hand, held for the taxpayer. Analyzing the interest provisions of the 1921 Revenue Act, the Judges ruled that "the return" meant "the original return, if bona fide, even if inaccurate". But the real gist of the decision was that these Judges found it "incredible" that the Bureau should demand such interest from "willing taxpayers" 24 F.2d p. 790.

In *Florsheim Bros. Drygoods Co. v. U.S.*, 280 U.S. 453, 50 S.Ct. 215, 74 L.Ed. 542 (1930) ("*Florsheim*"), under the 1918 Reve-

nue Act, Florsheim submitted a "tentative return", followed by a "completed return". In 1925, the Bureau assessed additional taxes for tax year 1918. Under the 1918 Revenue Act, the limitation period on tax assessment was 6 years after the filing of "a return". The date of additional assessment in 1925 was more than 6 years after the filing of the "tentative return", but less than 6 years after the filing of the "completed return". The Supreme Court, per Mr. Justice Brandeis, held that the limitation period should not be calculated from the first or "tentative" return, but from the second or "completed" return. Mr. Justice Brandeis assumed *arguendo* "that the filing of a return which is defective or incomplete ... is sufficient to start the running of the period of limitation; and that the filing of an amended return does not toll the period", *id.* 280 U.S. p. 462, 50 S.Ct. p. 218, 74 L.Ed. p. 548. In support of this assumed rule, he cited *Mabel* and *Bowers, id.* n. 6. But he held that any such rule was immaterial in this case, because the so-called "tentative return" was not a "return" at all: it was merely "an invention of the [Bureau] designed to meet a peculiar exigency", and was in the nature of a request for "extension of time for filing the required return, without defeating the government's right to prompt payment of the first installment", *id.* 280 U.S. p. 460, 50 S.Ct. p. 217, 74 L.Ed. p. 547. Since the "tentative return" did not rise to the dignity of a real "return" (even an erroneous one), it was not sufficient to start the limitation period running in the first place.

*Zellerbach Paper Co. v. Helvering,* 293 U.S. 172, 55 S.Ct. 127, 79 L.Ed. 264 (1934) ("*Zellerbach*") concerned the 1921 Revenue Act. Under the 1918 Revenue Act, for tax year 1920, Zellerbach Paper Co. ("Zellerbach") filed a tax return on July 16, 1921. On November 23, 1921, the 1921 Revenue Act became law, effective retroactive to January 1, 1921. When Zellerbach refigured its taxes under the new law for tax year 1920, Zellerbach found that it owed a few hundred dollars more in taxes. Zellerbach apparently considered this more trouble than it was worth; Zellerbach sent neither "a new or supplemental return" nor any additional payment. On May 11, 1928, the Bureau sent Zellerbach a notice of deficiency assessment for "large amounts", *id.* 293 U.S. p. 175, 55 S.Ct. pp. 128–29, 79 L.Ed. p. 266. These amounts included the adjustment of a few hundred dollars which should have been reported by "a new or supplemental return", but consisted mostly of other, unrelated matters going back to Zellerbach's original (and only) return filed on July 16, 1921. Under the 1921 Revenue Act, the limitation period on tax assessment was 4 years after the filing of "a return". Zellerbach argued that the 4–year period should be counted from the filing of its original (and only) return on July 16, 1921. The Bureau argued that "the return on file was a nullity" because it was erroneous; that Zellerbach should have filed a new return under the 1921 Revenue Act; that Zellerbach had not done so; "and hence that the statute of limitations had never been set running", *id.* 293 U.S. p. 176, 55 S.Ct. p. 129, 79 L.Ed. p. 267. The Supreme Court, per Mr. Justice Cardozo, held for the taxpayer Zellerbach.

The Bureau's main argument was that an inaccurate return is no return at all, but is only a "nullity" whose filing does not start the limitation period running for any purpose, *even if an amended return was never filed.* If adopted, this principle would practically eliminate any limitation period for returns which were less than precisely correct. Mr. Justice Cardozo's main concern was to refute such argument; and in this context he ruled that a return could still be "a return" even if it did not show "[p]erfect accuracy or completeness", *id.* He went on to state "that a second return, reporting an additional tax, is an amendment or supplement to a return already upon the files", *id.* 293 U.S. p. 180, 55 S.Ct. pp. 130–31, 79 L.Ed. p. 269. But he meant this remark to be taken in context of "administrative history" of "[s]uccessive revenue statutes" which created a larger tax liability "by supervening changes of the law", *id.* He made no comment on the creation (or at least disclosure) of a larger tax liability by *a change in the information or calculation under the same law,* because such was not the case or the issue before him. He further stated that "a second return ... being effective by relation does not toll a limitation which has once begun to run", *id.,* citing *Florsheim.* By "relation", Mr. Justice Car-

dozo meant "retroactivity". Thus he observed that the 1921 Revenue Act was retroactive, and that "[b]eing law by relation, to the disadvantage of the taxpayer, in respect of the burden of his tax, it may well have been law by relation to his benefit in respect of the form and time of his return", *id.* 293 U.S. p. 177, 55 S.Ct. p. 129, 79 L.Ed. p. 267. In other words, it seemed to him that, since the new tax law was substantively retroactive (so that taxes for tax year 1920 had to be refigured), it was only fair that the new tax law should also be procedurally retroactive (so that tax returns filed under the old law were not "nullified" but remained effective under the new law, even if "amend[ed]" or "supplement[ed]" later). He meant that an "amended or supplemental" return, *which* deals with new tax liability imposed retroactively, "does not toll a limitation which has once begun to run".

The Bureau protested that such a rule would "cut down the period available to the Bureau for audit and assessment", 293 U.S. p. 181, 55 S.Ct. p. 131, 79 L.Ed. p. 269. In addressing this practical objection, Mr. Justice Cardozo considered the practical aspects of the situation, and concluded that "[t]he reduction ... is not serious ... [t]he curtailment is too slight, the inconvenience too nearly negligible, to affect the process of construction", *id.* He pointed out that the Bureau's approach would cause its own forms of mischief, some of them serious. He chose Zellerbach's approach as the lesser evil. In so doing, Mr. Justice Cardozo did not purport to establish or rely upon some general principle applicable to all amended or supplemental tax returns. He merely stated "special reasons" for applying a "rule of reciprocity" in a special kind of tax case, 293 U.S. p. 177, 55 S.Ct. pp. 129–30, 79 L.Ed. p. 267.

Decided with *Zellerbach* was *National Paper Products Co. v. Helvering*, 293 U.S. 183, 55 S.Ct. 132, 79 L.Ed. 274 (1934) ("*National Paper* "). National Paper Products ("National Paper") was Zellerbach's subsidiary. On July 15, 1925, Zellerbach for itself and National Paper filed a correct consolidated return for fiscal year 1924–1925. Seven months later came the Revenue Act of 1926, retroactive to January 1, 1925. This changed the tax rate applicable to the first few months of calendar year 1925 from 12.5% to

13%. On May 14, 1926, Zellerbach filed an amended consolidated return for itself and National Paper, which

> did not repeat what had been stated in the return of July, 1925, then upon the files. All that it did was to refer to the net income as previously reported, and then apply the new rate to that part of the income stated to be attributable to 1925[,]

293 U.S. p. 185, 55 S.Ct. p. 133, 79 L.Ed. p. 275. The limitation period for assessments was 3 years. On October 10, 1928, the Bureau assessed a deficiency, for reasons not stated in the Supreme Court's opinion. Writing for the Court, Mr. Justice Cardozo noted the differences between this case and *Zellerbach:* the tax acts were different; the tax changes were different; and

> Here the taxpayers filed an additional return, supplementing the original one by a statement of the additional taxes due; there the taxpayer stood upon the original return, and omitted to file another[,]

293 U.S. p. 186, 55 S.Ct. p. 133, 79 L.Ed. p. 276. He curtly concluded,

> The conclusion [in *Zellerbach* ] is unaffected by any of these points of difference.
>
> For reasons stated in our opinion in [*Zellerbach* ], the period of limitation began to run on the filing of the first return, and a return for additional taxes, even if filed afterwards, was an amendment or supplement which did not toll the statute[,]

*id.* Therefore *National Paper,* like *Zellerbach,* is primarily a pragmatic exercise within the specific context of retroactive tax liability.

Other cases cited by debtors do not involve retroactive taxes under the Revenue Acts of the 1920's, but do involve other special factors.

Debtors cite *Bell v. Commissioner,* T.C. Memo. 1957–201, 16 T.C.M. (CCH) 915 (¶ 57,-201) (U.S. Tax Ct., October 24, 1957) (No. 60619, 60620) ("*Bell* "). In that case, the taxpayer initially filed "skeleton forms" which "did not disclose any details indicating sources of income and deductions nor ... reflect the tax computation", then later filed amended forms with fuller information. The Tax Court commented that "[t]he running of the statute of limitations cannot in any way be affected or suspended by the later filing of

1004

amended returns", *id.* p. 917. The comment is dictum. The Court actually held that the initial "skeleton forms" were not "returns" at all, sufficient to trigger the statute of limitation; and calculated the limitation period from the filing of the later, more complete returns. The Court's main concern was that the later returns, though delinquent, should not be treated as "fraudulent"; and this because of the facts of the taxpayer's personal history, not because of any overriding rule of law.

Debtors cite *Kaltreider Construction, Inc. v. U.S.*, 303 F.2d 366 (3rd Circ.1962) ("*Kaltreider*"). This case concerned a corporation, Kaltreider Construction Inc. ("Kaltreider Inc."), owned by Walter and Irene Kaltreider ("the Kaltreiders"). Kaltreider Inc. filed its income tax return for tax year 1952 on March 16, 1953. Four years later, Kaltreider Inc. filed an amended return for 1952 reporting additional tax of $3,289.69, and paid that amount. A year later, the Court of Appeals for the 3rd Circuit determined that the amount reported by the amended return and paid by Kaltreider Inc. should have been reported and paid by the Kaltreiders individually. Kaltreider Inc. sued for refund. Refund actions were to be brought within 3 years of filing of "the return"; the 3rd Circuit held that "the return" meant the original return, not the amended one. The 3rd Circuit cited *Zellerbach* as "directly in point", 303 F.2d p. 368. This Court finds *Kaltreider* questionable and distinguishable. *Kaltreider* is questionable, insofar as it treats the old retroactive-tax case(s) as "directly in point" in a new situation having nothing to do with retroactive taxes. *Kaltreider* is distinguishable, inasmuch as it is a refund-suit case, which rests ultimately on the sovereign's limited consent to be sued, and indulges an extreme pro-government rule of construction, 303 F.2d p. 368. This judicial stance is not assumed in tax collection cases such as the one now before this Court. In any event, *Kaltreider* comes from a different Circuit and is not binding on this Court.

Debtors cite *Dowell v. Commissioner*, 68 T.C. 646 (U.S. Tax Ct., August 1, 1977) (No. 2150–75). The issue therein is identical to that in *Badaracco*, discussed immediately below. The Tax Court held for the govern-ment; the Court of Appeals for the 10th Circuit reversed, at 614 F.2d 1263 (10th Circ. 1980); but the 10th Circuit's opinion was overruled by the Supreme Court's decision in *Badaracco*, which presumably restored some validity to the Tax Court's opinion. As discussed below, *Badaracco* is distinguishable. So is *Dowell.*

Debtors cite *Badaracco v. Commissioner*, 464 U.S. 386, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) ("*Badaracco*"). This case involved taxpayer fraud (and the policing thereof) under the Revenue Act of 1954. Writing for the Court, Mr. Justice Blackmun summarized *Zellerbach* and other cases in his footnote 8, but noted that these prior cases involved "other ... contexts", 464 U.S. p. 393, 104 S.Ct. pp. 761–62, 78 L.Ed.2d p. 558. In *Badaracco*, the taxpayer filed a fraudulent return, then later filed a nonfraudulent amended return. The limitation period for fraudulent returns was indefinite; the limitations period for nonfraudulent returns was 3 years. More than 3 years after the filing of the amended return, the Internal Revenue Service assessed a 50% penalty for fraud in the original return. The taxpayer asserted that the penalty assessment was barred by limitation. This time it was the taxpayer who proposed that his own initial return was a "nullity", 464 U.S. pp. 396–397, 104 S.Ct. pp. 763–764, 78 L.Ed.2d pp. 559–560. The taxpayer's theory was that his initial return, being a "nullity", was not "the return" sufficient to trigger the indefinite limitation period; but his amended return was sufficient to initiate the 3–year limitation period. The Supreme Court rejected this argument. As in earlier cases, the Court carefully considered policies and pragmatics in reaching its decision, 464 U.S. pp. 397–401, 104 S.Ct. pp. 763–766, 78 L.Ed.2d pp. 560–563.

OTC cites one case, namely *In re Greenstein*, 95 B.R. 583 (B.C., N.D.Ill.1989) ("*Greenstein*"). This case is also distinguishable, in that it deals with a late amended return under § 523(a)(1)(B)(ii), while the matter now before this Court concerns a timely amended return under § 523(a)(1)(A) adopting § 507(a)(8)(A)(ii). But *Greenstein* is not wholly irrelevant. In *Greenstein*, the taxpayer argued that his original returns were timely even though his amended returns were late, and that the timeliness of

the original returns was what counted. The Bankruptcy Court disagreed. The Court held that the purpose of the time periods in § 523(a)(1)

> is to allow the taxing authorities a reasonable time to collect the tax or create a lien on assets of the debtor. That period should begin with the filing of the return that reports or should report the debts the taxing authority seeks to collect. Until that return is filed, the taxing authority cannot be expected to take action to assess or collect the tax,

*Greenstein,* 95 B.R. p. 585. In the case of a State tax system of "piggyback" type, where

> the state tax is computed on the basis of the taxpayers['] federal tax return ... the state cannot be expected to audit tax returns filed with another jurisdiction ... Therefore, at least where the obligation to file an amended state return is triggered by the alteration of a federal or other state's tax, that amended return is a "return" for purposes of the Section 523(a)(1)(B)(ii) ... period[,]

*id.* pp. 585–586. If this rationale is applied to the admittedly distinguishable situation now before this Court, the amended return should be the "return" for purposes of the § 523(a)(1)(A) and § 507(a)(8)(A)(ii) period.

■ The upshot of all these cases is this. The question of when the limitation period commences on assessment or collection of a tax which has been reported in a tax return is to be answered, not by resort to some overriding general principle applied regardless of the situation, but by consideration of the practical aspects of the problem, and by balancing fairness to the taxpayer on the one hand with fairness to the taxing agency (whose operations depend largely on the taxpayer's own estimate of his tax debt) on the other. In situations where problems are created for taxpayers by strange legislative devices such as retroactive tax laws, courts tend to favor the taxpayer. In situations where problems are created for taxing agencies by taxpayers' misreporting of their own taxes, courts may tend to favor the taxing agency.

■ It appears to this Court that, in cases involving taxpayer misreporting, the following general approach is proper, at least absent special circumstances which make it unfair or impractical: the limitations period for an original tax return should commence on the filing of the original return; an amended return should not toll the period *as to the same taxes admitted to be owed in the original return;* but an amended return should toll the period *as to additional tax liability admitted for the first time in the amended return.*

■ The same principle may be used in applying the three-year period of 11 U.S.C. § 507(a)(8)(A)(ii). That period may be counted from the date of filing of an original return *as to the same taxes admitted to be owed in the original return;* but may be counted from the date of filing of an amended return *as to additional tax liability admitted for the first time in the amended return*—at least, absent special circumstances which make such rule unfair or impractical.

■ Here, debtors made their amended return to OTC on June 29, 1992, disclosing additional tax liability to OTC for the first time. The priority and nondischargeability period under § 507(a)(8)(A)(i) should be calculated from that date, i.e. from June 29, 1992. Debtors commenced this bankruptcy case on July 15, 1993. Only a little over one year separates those two dates. Accordingly, the tax debt newly disclosed by debtors' amended return fits comfortably within the three-year period of priority and nondischargeability established by § 507(a)(8)(A)(i). This Court is aware of no special circumstances which might make such application of § 507(a)(8)(A)(i) unfair or impractical.

Debtors also argue that their tax debt is dischargeable under 11 U.S.C. § 523(a)(1)(B)(ii). In *Lamborn I,* § 523(a)(1)(B) was not addressed. To whatever extent that statute might apply here, the two-year period of nondischargeability under § 523(a)(1)(B)(ii) should run from the date of the amended return, in like manner as the three-year period under § 523(a)(1)(A), § 507(a)(8)(A)(i) discussed immediately above. The tax debt newly disclosed by debtors' amended return fits comfortably within this two-year period.

In *Lamborn I,* this Court ruled that OTC had made no "assessment" of debtors' taxes

within the meaning of 11 U.S.C. § 507(a)(8)(A)(ii), (iii). As to the issue of "the assessment", debtors seek reconsideration for several reasons, which this Court addresses *seriatim.*

Debtors seek reconsideration on the ground that the OTC must make an assessment before proceeding by tax warrant, citing 68 O.S. § 223(a). Tax warrants are merely a mechanism for collection of a tax debt. If debtors were contesting enforceability of the tax warrants, their argument might have merit. But the question here is not enforceability of the tax warrants, but (assuming *arguendo* that they are enforceable) the dischargeability of the tax debt underlying the warrants.

Debtors seek reconsideration on the ground of discovery of new evidence. The new evidence consists of OTC's admission in the James matter that a tax was assessed *"without any notification* to the [debtors in that case] and *without issuing a 'proposed assessment,"* motion to reconsider p. 3 (emphases original). Debtors construe this as an admission that assessment may occur without either "notification" or issuance of a " 'proposed assessment' ". However, in *Lamborn I,* this Court did not rule that any particular "notification", or any document called "proposed assessment", was required to constitute an assessment. The Court ruled only that the bare filing of a return by the taxpayer need not constitute an assessment binding on the taxing authority as a matter of law, and that an assessment occurs when some (unspecified) act "indicate[s] that OTC has determined how much it thinks the taxpayer owes," *id.* 181 B.R. p. 104. The alleged revelation in the James matter still does not show that OTC made any such act and "indicat[ion]" in the present case. In any event, in the James case, OTC has withdrawn the alleged admission, which it characterizes as "an inadvertent misstatement," OTC's response p. 1.

Debtors seek reconsideration on the ground that lack of precise definition of what constitutes an "assessment" vests OTC with a wholly discretionary "power to more or less arbitrarily affect various individual taxpayers' rights without any legislative guidance or restriction," which debtors further assert

"runs afoul of the Due Process Clause of the Fourteenth Amendment" to the United States Constitution, motion to reconsider p. 6. This argument is not persuasive. Although OTC decides what action it will take in any given case, the Court (and not OTC) decides whether any action taken by OTC suffices to constitute an "assessment". The Court makes its determination after affording debtors due process.

The Court concludes that its earlier "Memorandum Opinion and Order" in *In re Lamborn* is essentially correct, though said order should be and is hereby modified and supplemented as set forth herein. Otherwise, debtors' "Motion for a New Trial or, in the Alternative, Motion for Reconsideration [or] to Alter or Amend Judgment" must be and is hereby denied.

AND IT IS SO ORDERED.